711 S.E.2d 280 (2011)
In re N.A., I.A., C.P. and M.P.
Nos. 35743, 35744.
Supreme Court of Appeals of West Virginia.
Submitted February 9, 2011.
Deicided May 26, 2011.
*283 Lauren Thompson, Esq., Thompson Law Office, PLLC, Williamson, WV, for Appellant J. G.
Michael L. Jackson, Esq., Assistant Attorney General, Charleston, WV, for Appellant Department of Health and Human Resources.
Charles Stanford West, Esq., Willamson, WV, for Appellees V.P. and D.P.
Diana Carter Wiedel, Esq., Willamson, WV, Guardian ad Litem.
PER CURIAM:
This case is before the Court upon the consolidated appeals of the Appellant J.G.[1] (also referred to as "Appellant Father"), who is the biological father of M.P., a minor child, and the Appellant Department of Health and Human Resources ("DHHR"). In each of the two cases the parties are appealing the May 21, 2010, final disposition order entered by the Circuit Court of Mingo County, West Virginia, wherein the circuit court denied the Appellant Father custody of M.P. and granted custody of four minor children, including M.P., to the maternal grandparents, D.P. and V.P. (also referred to collectively as "Appellee Grandparents" and individually as either the "Appellee Grandmother" or the "Appellee Grandfather").[2] The assignment of errors for both of the Appellants, are: 1) whether the circuit court erred in denying the Appellant Father custody of his child M.P., where there were no allegations of abuse or neglect against the Appellant Father; and 2) whether the circuit court erred in granting physical custody of the four minor children to the Appellee Grandparents pursuant to a post-adjudicatory improvement period where conditions of neglect existed in the home. Based upon a review of the record, the parties' respective briefs, including a brief submitted by the guardian ad litem, and oral arguments, the Court reverses the circuit court's decision and remands the case for further proceedings consistent with this opinion.

I. Factual and Procedural Background
On August 27, 2009, a petition for abuse and neglect was filed in the Circuit Court of Mingo County regarding N.A., now eleven, I.A., now eight, C.P., now seven, and M.P., now three. The petition was filed against T.P. ("the children's mother"), who is the biological mother of the children, and the Appellee Grandparents, all of whom were alleged to have care and custody of the children as the children and their mother were residing in the home of the Appellee Grandparents at the time the petition was filed. The petition also listed M.A., the biological father of N.A., I.A. and C.P., as well as Joshua G.,[3] who was initially identified as the father of M.P. and who was also identified as the children's mother's boyfriend.
The petition was based upon allegations of domestic violence between the children's mother and the Appellee Grandfather. The acts of domestic violence occurred in the presence of the children. There were also allegations in the petition of numerous prior referrals to the Appellant DHHR for the children's mother's drug abuse dating back to 2004. Additionally, there was the death of another child in 2007, an infant named P.P., who was in the children's mother's care when he died. The death occurred in the Appellee Grandparents' home and the Appellee Grandfather was at home when the death was reported. There was a criminal investigation into this death; however, an autopsy revealed that the cause of death of the child was undetermined. The medical examiner *284 noted that the head and facial injuries suffered by the child were not consistent with the description of the incident given by the children's mother. The medical examiner further observed evidence of anal stretching that was inconsistent with the children's mother's explanation of the child suffering from constipation. There was not enough evidence to substantiate a finding of abuse and neglect arising out of the child's death.[4]
At the August 31, 2009, preliminary hearing and despite the allegation of domestic violence against the Appellee Grandfather, the circuit court only found probable cause that abuse and neglect of the four children occurred by the children's mother. The circuit court ordered that the children remain in the legal custody of the Appellant DHHR, but granted physical custody of the four children to the Appellee Grandparents. The circuit court further directed the Appellee Grandparents not to allow their daughter to see the children or contact the children outside the scheduled supervised visitation.
Subsequently, at an adjudicatory hearing on September 29, 2009, the circuit court found clear and convincing evidence that the children's mother had neglected her children. The circuit court ordered that the Appellant DHHR retain legal custody of the children, while physical custody was to remain with the Appellee Grandparents, so long as the children's mother did not live in the home and did not have any contact with the children.
In November 2009, the Appellant DHHR prepared a court summary reflecting that the maternal grandparents were in compliance with the circuit court's order. In a December 2009 court summary, however, the Appellant DHHR stated that the Appellee Grandparents had violated the circuit court's order regarding visitation of the children by the children's mother at their home. It was also noted in the summary that while the Appellee Grandparents had been compliant with the Appellant DHHR's services, the Appellee Grandmother had major medical problems and the Appellee Grandfather had been undergoing radiation treatments for cancer, all of which prompted the Appellant DHHR's worker to suggest that the Appellee Grandparents seek help with the daily caregiving of the children. Finally, the Appellee Grandparents had not been fully compliant with their home study.
On December 29, 2009, the Appellant DHHR moved for immediate physical custody of the children due to repeated violations of the court order by the Appellee Grandparents regarding visitation of the children by the children's mother in violation of the circuit court's order. In a January 6, 2010, hearing, the Appellee Grandparents failed to appear. Based upon evidence presented at the hearing, the circuit court found that the Appellee Grandparents had been allowing constant contact between the children and their mother in violation of the court's orders. As a result, the children were removed from the Appellee Grandparents' home and placed in a foster home.[5]
On February 22, 2010, the children's mother finally disclosed that the Appellant Father could be the biological father of M.P. The circuit court ordered DNA testing of the Appellant and directed that the Appellant DHHR file an amended petition that included him in the action. The Appellee Grandparents requested that the children be returned to their physical custody and the DHHR objected. The circuit court set a separate evidentiary hearing regarding the Appellee Grandparents' request.
*285 The evidentiary hearing was conducted on February 25, 2010. The circuit court heard testimony from the medical examiner regarding the death of P.P. in the home of the Appellee Grandparents. The medical examiner explained that the location of bruising found on the child and the presence of anal stretching were inconsistent with explanations offered by the children's mother. The children's mother had explained that the child had become wedged between the bed and the wall while co-sleeping with her and that the anal stretching was due to constipation. Despite the medical examiner's concerns, the cause of death was listed as undetermined.
Melissa Muenich of the DHHR testified that the Appellee Grandparents had repeatedly cancelled appointments for her to conduct aspects of the home study, which still had not been completed. She testified about going to the Appellee Grandparents' home for a scheduled visit, hearing the youngest child crying, and knocking on the door. No one responded to allow her to enter the home. Ms. Muenich described several attempts to contact the Appellee Grandparents regarding completion of the home study. Ms. Muenich further testified that on her first visit to the Appellee Grandparents' home, she had heard the Appellee Grandfather threaten the children with a belt. Also, a background check on the Appellee Grandfather revealed a 2005 conviction for battery and a 2009 conviction for domestic battery. Ms. Muenich testified that she had again scheduled the completion of the home study for February 26, 2010.
Ronald May, a Family Options Worker, testified that he saw the children's mother arguing with the Appellee Grandfather in the Appellee Grandparents' home during one of his scheduled visits to offer parenting classes to the Appellee Grandparents.
M.A., the biological father of N.A., I.A. and C. P., testified that when he spoke to the children's mother on the day of the hearing, she told him that she was still residing with the Appellee Grandparents, which was in violation of the circuit court's orders. M.A. recounted that when the children's mother had overdosed on drugs and was in the hospital, he and the Appellee Grandfather had gotten into a physical altercation in the presence of one of the children. The altercation resulted in a battery charge being filed against the Appellee Grandfather.
Vickie Fields, a Child Protective Services ("CPS") worker, testified that the three oldest children soiled their underwear regularly. The CPS worker testified that one child had disclosed to the foster parents that someone had "messed with him." This resulted in an appointment with Joan Phillips, M.D. The child did not disclose anything to Dr. Phillips and there was no additional evidence offered to substantiate the claim. Ms. Fields further testified that she was present and witnessed when the children were interviewed in connection with the alleged sexual abuse claim. During the interview, I.A. told the interviewer that he had been "whipped with a belt" and C.P. disclosed that he had been "beaten with a broomstick[,]" while also telling the interviewer that N.A. "was whipped more than anybody else," because "he poops on himself and he gets whipped and has to stand in the corner." Ms. Fields testified that the psychological testing ordered to be performed on the Appellee Grandparents had not been completed yet, due to the Appellee Grandfather's cancer treatment. Ms. Fields further testified that she did not believe that the Appellee Grandparents could protect the children from the children's mother given their history, which included telephone calls made by the children's mother to the Appellant DHHR from the Appellee Grandparents' home. Ms. Fields testified that she had discussed with the Appellee Grandparents the importance of keeping the children's mother away from their home.
At the conclusion of this hearing, the circuit court found that there was no concrete evidence of sexual abuse presented during the hearing outside the allegations made by the oldest child to the foster father. The Court ordered the children to remain in the physical and legal custody of the Appellant DHHR pending the final dispositional hearing.
The dispositional hearing was conducted on March 15, 2010. The circuit court first heard from the attorney for the Appellant *286 DHHR that the Appellant Father had been identified as the biological father of M.P. The Appellant DHHR informed the circuit court that it had no allegations against J.G. and moved that he be dismissed from the action and granted intervenor status. The circuit court granted the Appellant DHHR's motion.
Next, the circuit court heard evidence regarding the children's mother, and considered the Appellee Grandparents' request to have physical custody of the children returned to them. Ms. Fields, the CPS worker, testified that the children's mother was totally financially dependent upon the Appellee Grandparents and relied heavily upon them for transportation. Ms. Fields continued her recommendation that the Appellee Grandparents' home was not an appropriate placement. She testified that she did not feel that the Appellee Grandparents would comply with the circuit court's orders based upon a history of violating those orders regarding keeping the children's mother away from the children.
Ms. Fields further testified that the Appellant Father, M.P.'s biological father, had no knowledge that M.P. was his child until he was contacted by the Appellant DHHR. The Appellant Father had been cooperative with the Appellant DHHR. Further, Ms. Fields testified that both the Appellant Father and his current wife were approved foster care parents. According to the testimony, the Appellant Father and his wife currently had one foster child in their home, which was approved for two children, and the foster child was well adjusted with no problems being reported in the home. The Appellant Father also had another biological child who was in the custody of the biological mother, but with whom the Appellant Father had contact. Additionally, after learning that he was M.P.'s biological father, the Appellant Father indicated that he desired to have custody of the child. Both the Appellant DHHR and the guardian ad litem recommended that the Appellant Father be given custody of M.P. Further, there was testimony that Appellant Father and his current wife were supportive of sibling visitation, which was recommended by both the Appellant DHHR and the guardian ad litem.
The Appellee Grandmother also testified. She confirmed that she suffered from high blood pressure, diabetes, knee problems, heart problems and kidney problems. She also stated that she helped the Appellee Grandfather with cancer treatments. The Appellee Grandmother testified that she desired to have custody of her grandchildren. When questioned about the reports that the Appellee Grandfather whipped N.A. for soiling in his pants, she stated that "I'm going to tell you, them two little boys [referring to her grandchildren] lie." The Appellee Grandfather did not testify at the hearing.
By Order entered May 21, 2010, the circuit court made the following factual findings regarding the Appellee Grandparents:
23. The Respondents, . . . [the Appellee Grandparents], have played an active role in the subject children's lives for most of each of the children's lives, has [sic] provided financial and emotional support for each of the children, and have acted as a mother and father figure to the subject children. The Court FINDS that the Respondents. . . have been and are for all intents and purposes psychological parents of the subject children.
24. The Court FINDS that the Respondents. . . have neglected the subject children, engaged in domestic violence, failed to protect the subject children, and has [sic] participated in at risk behaviors that have endangered the subject children.
The circuit court, however, went on to find that it "believes it is in the best interests of the children to grant the Respondents . . . one last opportunity to resolve their remaining issues." Thus, the circuit court granted a post-dispositional improvement period for a period of ninety days and declined to terminate the Appellee Grandparents' rights. The circuit court set forth certain conditions and directed that the Appellee Grandparents were to have weekend visitations with the children in their home for four consecutive weeks and that their daughter, the children's mother, was not to be present in the home when the children were present. If, after those visitations had occurred, there were no violations of the conditions of the improvement *287 period, physical custody was to be transferred to the Appellee Grandparents.[6]
Concerning the Appellant Father, the circuit court found in its May 21, 2010, order that he was the biological father of M.P. and had been cooperative with services in the matter. The circuit court further found that both the Appellant Father and his current wife had an approved foster care home and that the Appellant Father had another biological child that he visits. The court also found that the Appellant Father's home was large enough for two children.
Despite the foregoing factual findings, which failed to include any allegations or evidence of abuse, neglect, or unfitness to parent, the circuit court determined that the Appellant Father was entitled only to visitation with M.P. The circuit court ordered regularly-scheduled visitation between the Appellant Father and M.P. The circuit court, however, decided that "it was in the best interests of the children to remain together with their psychological parents and not to be separated."
Also contained in the record, but apparently not considered by the circuit court in its May 21, 2010, order, for reasons not apparent in the record, were the psychological reports concerning the Appellee Grandparents, as well as the completed home study. The psychological reports were both dated April 19, 2010, and the home study was completed on May 3, 2010. According to the psychological evaluation of the Appellee Grandfather, there were significant domestic violence episodes between the Appellee Grandfather and the children's mother which occurred in the presence of the children. The psychologist's recommendations indicated that the Appellee Grandfather reported "significant impairment with psychological and medical functioning which would interfere with his ability to parent his grandchildren." The report further noted "[p]ersonality maladjustment and significant anger problems are primary concerns and place his grandchildren at risk for abuse and neglect." Significantly, the Appellee Grandfather "shows no remorse or desire to alter his behaviors. . . ."
Similarly, regarding the Appellee Grandmother, the psychologist found that "[s]he is overwhelmed with depression, anxiety and dependency issues and this complicates her ability to effectively make decisions for her family, provide a safe environment for the grandchildren and be emotionally available for the children." Not only did the Appellee Grandmother report being the victim of abuse in the past, but she also acknowledged that she allowed domestic violence between her daughter and the Appellee Grandfather in front of the children without intervention by her. Based upon these evaluations, the psychologist did not recommend placement of the children with the Appellee Grandparents.
Additionally, the home study was completed on or about May 6, 2010. The Appellee Grandparents' home was not approved for placement of the children by the DHHR. In the home study, Ms. Muenich explained the reasoning for the failed approval which included: 1) the Appellee Grandfather's prior convictions for battery and domestic violence; the Appellee Grandfather had a child maltreatment finding from July 2009;[7] 2) the home did not meet the DHHR standards of providing each child with their own bed as the evidence as that the children were all sharing a bed and that the Appellee Grandfather was sleeping in this bed with them, even though the Appellee Grandfather had his own bed; 3) the home was also noted as having badly soiled carpets and furniture, as well as a dirty odor; 4) the Appellee Grandparents' failure to return a form entitled "Application" despite being asked repeatedly for it; 5) the failure to provide medical reports regarding their physical health; and 6) the Appellee Grandfather's failure to sign a consent to obtain his mental health treatment records at the Veteran's Administration.[8]

*288 II. Standard of Review
The applicable standard of review of the circuit court's order is the two-pronged standard set forth in syllabus point one of McCormick v. Allstate Insurance Co., 197 W.Va. 415, 475 S.E.2d 507 (1996), which provides as follows:
When this Court reviews challenges to the findings and conclusions of the circuit court, a two-prong deferential standard of review is applied. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.
Id. at 417, 475 S.E.2d at 509, Syl. Pt. 1; see also Syllabus, In re Brandon Lee B., 211 W.Va. 587, 567 S.E.2d 597 (2001), cert. denied, 536 U.S. 942, 122 S.Ct. 2627, 153 L.Ed.2d 808 (2002); Syl. Pt. 2, In re Beth Ann B., 204 W.Va. 424, 513 S.E.2d 472 (1998); Syl. Pt. 1, State v. Michael M., 202 W.Va. 350, 504 S.E.2d 177 (1998). Further guidance regarding the standard of review is found in In re Tiffany Marie S., 196 W.Va. 223, 470 S.E.2d 177 (1996), wherein the Court held that
[a]lthough conclusions of law reached by a circuit court are subject to de novo review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.
Id. at 225-26, 470 S.E.2d at 179-80, Syl. Pt. 1. Keeping the foregoing standards and principles in mind, the Court turns to a discussion of the issues at hand.

III. Discussion of Law

A. Biological Father's Rights
The first issue before the Court is whether the circuit court erred in denying the Appellant Father custody of his biological child M.P., where there were no allegations of abuse or neglect against the Appellant Father. Both the Appellant DHHR and the Appellant Father argue that the circuit court failed to consider that as the biological father, the Appellant Father has a fundamental right to custody of his son where there are no allegations of abuse and neglect against him.[9] While not a model of clarity and with virtually no reasoning, it appears that the *289 Appellee Grandparents, in their appellate brief, argued that the father failed to follow through on his duty to care for and support his child and thus the circuit court did not err in awarding them custody of M.P. The Appellee Grandparents advance this argument despite the fact that the biological father had no knowledge that he was M.P.'s father until the March 2010 hearing.
In syllabus point one of In re Willis, 157 W.Va. 225, 207 S.E.2d 129 (1973), this Court held:
In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.
Id. at 225, 207 S.E.2d at 130-131, Syl. Pt. 1. While this right is not absolute it is "limited or terminated by the State, as [p]arens patriae, if the parent is proved unfit to be entrusted with child care." Id. at 225, 207 S.E.2d at 131, in part, Syl. Pt. 5. Thus, the Court further stated in Honaker v. Burnside, 182 W.Va. 448, 388 S.E.2d 322 (1989), that
[a]lthough the welfare of the child is of immeasurable importance, another important principle which must be considered is that of a natural parent's right to raise his or her own child. "The right of a parent to the custody of his or her child is based on natural law and arises because the child is his or hers to care for and rear, . . ." State ex rel. Harmon v. Utterback, 144 W.Va. 419, 426, 108 S.E.2d 521, 526 (1959). Although the polar star concept is adhered to by this Court in child custody cases, we have "refused to apply it in cases where the parents have not abandoned the child or have in no manner been proved to be unfit to have the care and custody of such child." Hammack v. Wise, 158 W.Va. 343, 347, 211 S.E.2d 118, 121 (1975). This concept "will not be invoked to deprive an unoffending parent of his natural right to the custody of his child." Hammack, 158 W.Va. at 347, 211 S.E.2d at 121.
Honaker, 182 W.Va. at 451, 388 S.E.2d at 324.
In the instant case, it is undisputed that J.G. is the biological father of M.P. Further, the record is devoid of any allegations of abuse and neglect committed by J.G.[10] To the contrary, the Appellant Father *290 and his wife have been approved as foster care parents. Succinctly stated, there is nothing in the record which supports a finding that the Appellant Father is not a suitable biological parent who has the right to custody of his natural child, M.P. Thus, the circuit court erred in not granting the Appellant Father custody of his child.
It is equally important that the Court also consider whether it is in the best interests of M.P. to a continued relationship with his siblings. Honaker, 182 W.Va. at 452, 388 S.E.2d at 325 ("The best interests of the child concept with regard to visitation emerges from the reality that `[t]he modern child is considered a person, not a sub-person over whom the parent has an absolute and irrevocable possessory right. The child has rights. . . .'"). This right is grounded in the best interests of the child as well as "`the need for stability in the child's life. . . . [T]ermination of visitation with individuals to whom the child was close would contribute to instability rather than provide stability.'" Id. at 452, 388 S.E.2d at 326 (quoting Note, Visitation Beyond the Traditional Limitations, 60 Ind.L.J. 191, 221-22 (1984)). To that end, in James M. v. Maynard, 185 W.Va. 648, 408 S.E.2d 400 (1991), the Court held in syllabus point four that
[i]n cases where there is a termination of parental rights, the circuit court should consider whether continued association with siblings in other placements is in the child's best interests, and if such continued association is in such child's best interests, the court should enter an appropriate order to preserve the rights of siblings to continued contact.
Id. at 649, 408 S.E.2d at 401.
In the instant matter, both the Appellant DHHR and the guardian ad litem recommended that it would be in the best interests of M.P. to have continued visitation with his siblings. M.P. has grown up with his siblings, having never been separated from them. Under these circumstances where siblings have been together their entire lives, there is a strong presumption that it is in the best interests of the children that they maintain their sibling relationship through continued visitation if possible. Consequently, on remand, the Court directs the circuit court to consider the continued association of M.P. with his siblings under the presumption that the continued association of M.P. with his siblings is in all the children's best interests. If the circuit court determines that continued visitation between M.P. and his siblings is in the best interest of the children, the Court should develop an appropriate sibling visitation plan that will provide for meaningful continued contact between M.P. and his siblings so the siblings are not denied a continued relationship.

B. Post-Adjudicatory Improvement Period
The next issue is whether the circuit court erred in granting physical custody of the four minor children to the Appellee Grandparents pursuant to a post-adjudicatory improvement period where conditions of neglect existed in the home. The Appellant DHHR argues that the circuit court erred in granting any post-adjudicatory improvement period because the Appellee Grandparents failed to demonstrate that there is a reasonable likelihood that they can substantially correct the conditions of neglect in the near future. In contrast, the Appellee Grandparents argue that the circuit court did not err in granting them a post-dispositional improvement period because they were the psychological parents of the children.[11]
*291 As with all abuse and neglect proceedings, "the best interests of the child is the polar star by which decisions must be made which affect children." Michael K.T. v. Tina L.T., 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) (citation omitted). This Court has repeatedly stated that "the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, in part, In re Katie S., 198 W.Va. 79, 479 S.E.2d 589 (1996).
Moreover, this Court recognized the concept of a psychological parent in In re Clifford K., 217 W.Va. 625, 619 S.E.2d 138 (2005). In Clifford K, the Court held in syllabus point three that
[a] psychological parent is a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and provides for the child's emotional and financial support. The psychological parent may be a biological, adoptive, or foster parent, or any other person. The resulting relationship between the psychological parent and the child must be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian. To the extent that this holding is inconsistent with our prior decision of In re Brandon L.E., 183 W.Va. 113, 394 S.E.2d 515 (1990),[12] that case is expressly modified.
217 W.Va. at 630, 619 S.E.2d at 143, Syl. Pt. 3 (Footnote added).
Simply because a person is found to be a child's psychological parent, however, does not translate into the psychological parent getting custody of the child. Rather, this Court has only gone so far as to hold that the status of "psychological parent" entitles the individual to intervene in a custody proceeding, "when such intervention is likely to serve the best interests of the child(ren) whose custody is under adjudication." Id. at Syl. Pt. 4, in part. Thus, custody determinations regarding a child or children are still controlled by what is in the best interests of the child(ren).
In the case sub judice, the record is replete with the Appellee Grandparents' continued and repeated violations of orders entered by the circuit court regarding visitation by the children's mother with the subject children throughout the proceedings. Despite the circuit court's terminating the children's mother's rights, the Appellee Grandparents have continued to allow visitation between the children and their mother in direct violation of the circuit court's order that is the subject of the instant appeal. Further, there is also evidence in the record that the Appellee Grandparents have violated that order by not allowing the Appellant Father to visit his child and by failing to comply with psychological appointments scheduled for the children. Additionally, the record contains a failed home study of the Appellee Grandparents' home, as well as the psychologist's opinions after evaluating both of the Appellee Grandparents that their home was not a proper placement for the children. These documents were submitted to the circuit court prior to the entry of the *292 May 21, 2010, order; however, the circuit court failed to address the documents in its order.
Given this Court's continued adherence to the well-established precedent that placement of children with their grandparents must be in the best interests of the children, the circuit court completely overlooked this polar star in reaching its decision. The circuit court gave little consideration to the fact that an infant had died in the Appellee Grandparents' home with the Appellee Grandfather present and with no real explanation by him as to how the death occurred. Moreover, the children reported that the Appellee Grandfather whipped them with belts and broomsticks, with the only explanation offered by the Appellee Grandmother being that the children lie. The children were sharing a bed with their Appellee Grandfather, even though he had his own bedroom. Lastly, the Appellee Grandparents nonchalantly were being allowed by the circuit court to violate its orders, especially regarding visitation with the children's mother, with absolutely no explanation or consequences. The circuit court erred in granting a post-termination improvement period that allowed transfer of the physical custody of the children back to the Appellee Grandparents.
When custody of children is changed, gradual transition periods should be used whenever possible. See Syl. Pt. 3, James M. v. Maynard, 185 W.Va. 648, 408 S.E.2d 400 (1991) ("It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives."). In the instant case, such a gradual transition seems well-warranted. However, given the repeated wilful violation of the circuit court's orders by the Appellee Grandparents, as well as the fear that the guardian ad litem, the Appellant DHHR's workers, and the Appellant Father and his wife have of the Appellee Grandfather, as revealed to the Court during oral argument and as illustrated by the record, this may not be a case in which a gradual transition period is suitable in light of serious questions about the safety and welfare of the children involved.
Upon remand, the lower court should set a hearing forthwith, bringing all the parties and their counsel in for a full hearing on the most effective means of transitioning the children while still protecting their safety. The lower court should make very clear that its orders will be followed without recalcitrance, interference, or hostility, and that if a transition period is established, the Appellee Grandfather and all other parties must work cooperatively or risk serious sanction. In addition, the circuit court, on remand, may consider whether the children should have continued visitation with their grandparents given the evidence that there is a strong psychological bond between the children and the Appellee Grandparents. See Syl. Pt. 11, In re Jonathan G., 198 W.Va. 716, 482 S.E.2d 893 (1996) ("A child has a right to continued association with individuals with whom he has formed a close emotional bond, including foster parents, provided that a determination is made that such continued contact is in the best interests of the child."). It is imperative, however, that the circuit court focus on whether such continued contact is in the best interests of the children involved in light of the Appellee Grandparents' pattern and practice of violating court orders, as well as the Appellee Grandfather's apparent use of fear and intimidation. At a minimum, the circuit court, if examining any issues of visitation between the Appellee Grandparents and the children, should give due consideration to supervised visitation at a neutral location in the event that the circuit court determines that such visitation is warranted.
Also, it is critical in this case for the Appellant DHHR to immediately develop permanency plans for all the children, I.A., N.A., and C.P. While there is some indication in the record that the children's last foster care parents may be a viable permanent placement as the foster care parents continued to visit with the children until the Appellee *293 Grandparents stopped the visitation, counsel for the DHHR, during oral argument, was unable to state that that foster care home, indeed, was a permanent placement for the children. Recently in State ex rel. West Virginia Department of Health and Human Resources v. Pancake, 224 W.Va. 39, 680 S.E.2d 54 (2009), the Court reiterated the following fundament principle concerning the securing of a permanent placement for children:
The early, most formative years of a child's life are crucial to his or her development. In re Carlita B., 185 W.Va. 613, 623, 408 S.E.2d 365, 375 (1991). We have repeatedly emphasized that "children have a right to resolution of their life situations, to a basic level of nurturance, protection, and security, and to a permanent placement." State ex rel. Amy M. v. Kaufman, 196 W.Va. 251, 257, 470 S.E.2d 205, 211 (1996).
Pancake, 224 W.Va. at 43, 680 S.E.2d at 58.
The children should not be moved from place to place with no permanency plan and every effort should be made to ensure continued contact between the siblings. Further, the children should be provided with counseling services by the DHHR, and the circuit court should enter an order so directing.
The lower court faces a Herculean task of requiring wisdom, compassion, and the strength to protect the children to the greatest degree possible from physical and emotional harm, and to create stability and safety.

IV. Conclusion
Based upon the foregoing, the May 21, 2010, final disposition order entered by the Circuit Court of Mingo County is hereby reversed and this case is remanded for further expedited proceedings consistent with this opinion. The mandate of this Court shall issue contemporaneously herewith.
Reversed and remanded with directions.
NOTES
[1] The Court's customary practice in cases involving minors is to refer to the parties by their initials rather than by their full names. See, e.g., In re Cesar L., 221 W.Va. 249, 252 n. 1, 654 S.E.2d 373, 376 n. 1 (2007).
[2] The children's mother, T.P. (referred to as the "children's mother") had her parental rights terminated by the circuit court in the same May 21, 2010, order that is the subject of the instant appeal. The Court refused T.P.'s petition for appeal on November 17, 2010.
[3] Because Joshua G., who was ultimately found not to be M.P.'s biological father, has the same initials as the Appellant Father, the Court will refer to Joshua G. by his first name and last initial.
[4] There were also allegations regarding M.A., the biological father of I.A., N.A., and C.P., as well as Joshua G., the boyfriend of the children's mother. Those allegations, however, are not relevant to resolving the instant appeal.
[5] At a hearing that occurred on January 27, 2010, M.A. voluntarily relinquished his parental rights to his children, N.A., I.A. and C.P. It was also brought to the circuit court's attention that Joshua G. was questioning whether he was M.P.'s biological father, despite his name appearing on the child's birth certificate. Joshua G. moved to the court for a DNA test, which motion was joined by the child's mother. The DNA testing revealed that Joshua G. was not M.P.'s biological father. Joshua G. moved to voluntarily relinquish his parental rights regarding M.P. at the hearing on February 22, 2010. At the February 25, 2010, hearing the circuit court granted Joshua G.'s motion.
[6] According to the court summary, this transfer of physical custody from the foster care parents to the Appellee Grandparents occurred in July of 2010.
[7] While there is no more discussion of this maltreatment finding in the completed home study, presumably it was as a result of the domestic violence charge which occurred in the presence of one of the children.
[8] Subsequent to the May 21, 2010, order that is the subject of the instant appeal, in a monthly court summary prepared by DHHR and dated June 7, 2010, the three oldest children reported at therapy and counseling sessions that they had seen their mother, T.P., on the weekend visitation with the Appellee Grandparents. Also, an order entered June 29, 2010, reveals that the Appellant DHHR moved the circuit court for "an Order requiring the Sheriff of Mingo County to accompany any social workers visiting the home of the . . . [Appellee Grandparents]" for purposes of providing supervision of the children for drop in visits to the Appellee Grandparents' home. The circuit court denied the DHHR's motion, but admonished the Appellee Grandparents regarding their behavior and their need to cooperate with the DHHR. In another Order From Judicial Review, that was entered on September 1, 2010, following an August 23, 2010, hearing, the Court noted that the Appellant Father had advised the Court that the Appellee Grandparents "had failed to comply with the Court's prior Order regarding visitation." Additionally, the order reveals that the guardian ad litem, Diana Carter Wiedel, advised the circuit court that the Appellee Grandparents had not been complying with the circuit court's prior order regarding services for the children as the children had not attended any therapy sessions since being transferred to the custody of the Appellee Grandparents.
[9] The Appellee Grandparents maintain that the DHHR has no standing to raise any argument in favor of the Appellant Father. The Court readily dispenses with this argument finding that it is not supported either by statute, West Virginia Code §§ 49-6-1 to -12 (2009), or case law.
[10] In her November 3, 2010, letter to this Court, the children's guardian ad litem, Ms. Wiedel, states that the Appellant Father "has failed to fully exercise the visitation awarded to him since the dispositional hearing." The guardian ad litem goes on to state that

[a]t the dispositional hearing, I agreed with the Court's decision not to terminate his parental rights to the child, M[.], but at the present time, I believe that he has not [sic] intention of exercising those rights. Therefore, I believe it would be in the child's best interest to terminate those rights so that the child may be adopted with his brothers.
This statement was predicated upon testimony elicited by the Appellee Grandparents at a post-dispositional evidentiary hearing in which the former foster parent testified that the Appellant Father failed to exercise his visitation as permitted. There, however, is no specific information in Ms. Wiedel's letter setting forth any factual details regarding how the Appellant Father failed to exercise his visitation with his child. Further, Ms. Wiedel failed to attach the hearing transcript containing the testimony of the former foster parent regarding the Appellant Father's visitation with his child, so that hearing transcript is not included in the record on appeal. Significantly, no petition has been brought against the Appellant Father seeking termination of his parental rights and there was no evidence before the circuit court warranting termination of the Appellant Father's parental rights to M.P.
In her summary response, the guardian ad litem, rather than arguing for termination of J.G.'s parental rights, simply asserts that the circuit court did not err in its determination that it was in the best interests of all of the children involved to keep them together and not to separate them.
Since the entry of the May 21, 2010, order, it can be gleaned from the record, as well as from the oral arguments before the Court, that the reason that the Appellant Father may not have been keeping scheduled visitation with M.P. may be due to the Appellant Father's fear of the Appellee Grandfather. For instance, at an August 2010 hearing, the Appellant Father informed the circuit court that the Appellee Grandparents were not allowing him the visitation ordered by the circuit court. There was also a request by the Appellant DHHR, reflected in an order entered June 29, 2010, for "an Order requiring the Sheriff of Mingo County to accompany any social workers visiting the home of the. . . [Appellee Grandparents]" for purposes of providing supervision of the children for drop in visits to the Appellee Grandparents' home. Finally, during oral argument before this Court, counsel for the Appellant Father and the guardian ad litem stated that there was a considerable amount of fear felt by the guardian ad litem, the Appellant Father and his wife, and the DHHR workers in having to deal with the Appellee Grandfather.
[11] While the Appellee Grandparents argue on appeal that they are entitled to the grandparent preference as set forth in West Virginia Code § 49-3-1(a) and discussed by the Court in In re Elizabeth F., 225 W.Va. 780, 696 S.E.2d 296 (2010), a review of the circuit court's order reveals that the circuit court's determination to grant the post-adjudicatory improvement period was based upon its determination that the Appellee Grandparents were the children's psychological parents and not based upon the grandparent preference. As the grandparent preference was not raised or considered below, it is not considered by the Court in the instant appeal.

However, this Court has recently held that the grandparent preference is not dispositive, nor does it override the child's best interests. Kristopher O. v. Mazzone, 227 W.Va. 184, 193, 706 S.E.2d 381, 390 (2011) ("In In re Elizabeth F., this Court explained that 'an integral part of the implementation of the grandparent preference, as with all decisions concerning minor children, is the best interests of the child.'"). Further, the grandparent preference relates to the "adoption of a child in situations wherein the parental rights have been terminated." Id.
[12] This Court had previously held in In re Brandon L.E., that

[i]f a child has resided with an individual other than a parent for a significant period of time such that the non-parent with whom the child resides serves as the child's psychological parent, during a period when the natural parent had the right to maintain continuing substantial contact with the child and failed to do so, the equitable rights of the child must be considered in connection with any decision that would alter the child's custody. To protect the equitable rights of a child in this situation, the child's environment should not be disturbed without a clear showing of significant benefit to him, notwithstanding the parent's assertion of a legal right to the child.
183 W.Va. at 114, 394 S.E.2d at 516, Syl. Pt. 4.