408 S.E.2d 400

**JAMES M., Timothy M., Ike S.M., and Brandon C.M., infants under the age of eighteen years, Petitioners,**

**v.**

**Honorable Elliott E. MAYNARD, Judge of the Circuit Court of Mingo County, and Steve M., Respondents.**

**No. 19948.**

Supreme Court of Appeals of West Virginia.

Submitted March 12, 1991.

Decided July 29, 1991.

Jane Moran, Williamson, for petitioners.

Teresa McCune, Williamson, for respondent Steve M.

WORKMAN, Justice:

This case is before the Court upon a petition for writ of prohibition [1] against the Honorable Elliott E. Maynard, Judge of the Circuit Court of Mingo County, by the petitioners, James M.[2], Timothy M., Ike S.M., and Brandon M., who seek relief from a January 11, 1991, order in which the lower court granted the respondent father, Steve M.'s, motion for an in-home improvement period in Ohio and further ordered that Timothy M. and James M. be surrendered to respondent's custody on the night of January 11, 1991, with Ike S.M. and Brandon M. being surrendered to his custody within thirty days thereafter.[3] Petitioners contend that the court abused its discretion in awarding the father of the children an in-home improvement period and disregarding the compelling needs and best interests of the children. We agree with the petitioners' contention and award the writs of prohibition requested, thereby reversing the lower court's ruling and directing the lower court to enter an order terminating the parental rights to these children.

During the course of the proceedings below, Betty M. related a marital history marked by her husband's alcohol abuse and physical abuse toward her severe enough to have required her hospitalization. There were frequent separations, the last in late December 1988, when Steve M. quit his job, abandoned the family and moved to Ohio. When Steve M. departed, he left his wife no transportation and a $1,500.00 heating bill. At that time, James (or Jamie) was three years old, Timothy (or Timmy) was two years old, Ike was approximately twelve months old, and Betty M. was pregnant with their fourth child, Brandon. The family had been living in a trailer in Justice, Mingo County, for approximately three weeks, but was unable to pay the rent after Steve M's departure and stayed temporarily at the Tug Valley Recovery Shelter.

When Betty M. was abandoned with three children under four and another on the way, she was not well-equipped to survive. The record reflects that she had also been a victim of physical and emotional abuse by an alcoholic father. Married at seventeen, she had a full scale I.Q. of seventy-six, and her verbal comprehension skills were also very low. Psychological evaluations indicated she was unable to cope with many of life's simplest problems, with one of her most pronounced ineptitudes being in the area of parenting.

Meanwhile, on December 29, 1988, not long after Steve M. left his family, the Department of Human Services [4] (hereinafter referred to as DHS) was referred to the home where Betty M. and her three children were then living. The DHS report indicated that at the time of the referral, the children were found to be dirty and improperly dressed, with no coats or shoes. Further, the oldest child was suffering from swollen genitals, a condition which Betty M. told DHS had existed for some time, and the youngest child had a cold and severe diarrhea. The family was living a somewhat nomadic lifestyle, moving about

1. Although the petition was filed as a writ of prohibition, it also clearly sounds in mandamus and is treated as both.

2. Consistent with our practice in cases involving sensitive matters, we use the victims' last name initials. Since, in this case, the victims are related to the respondent, we have referred to him by his last name initial also. *See State v. Edward Charles L.,* 183 W.Va. 641, 398 S.E.2d 123 n. 1 (1990) (citing *Benjamin R. v. Orkin Exterminating Co.,* 182 W.Va. 615, 390 S.E.2d 814 n. 1 (1990)).

3. It is important to note that the petitioners' attorney immediately requested a stay of execution of the lower court's ruling from Friday, January 11, 1991, until Monday, January 14, 1991, so that relief could be sought from this Court. The lower court refused to issue that stay even for a three-day period; however, on January 17, 1991, this Court ordered that the execution of the January 11, 1991, order be stayed and that the children be returned forthwith to the custody of the Department of Human Services. Further, on January 24, 1991, this Court denied a motion to vacate the stay brought on behalf of the respondent father, Steve M.

4. The Department of Human Services is now known as the Division of Human Services, and is now a part of the Department of Health and Human Resources. *See* W.Va.Code § 5F-2-1(d)(2) (1990); W.Va.Code § 5F-2-1(j) (1990); W.Va.Code § 9-2-1a (1985).

from place to place. At the time of the referral to DHS, they were residing with three men, at least one of whom was described as very loud, intoxicated, and rude on the occasion of the DHS visit.

On that same day, DHS transported the family to a health care center where the children were examined and treated. Jamie was referred to a physician for his genital condition. The family was also assisted with food, shelter, clothing, transportation, and parenting counselling. They were placed at the Mountaineer Hotel from December 29, 1988, through January 4, 1989, under a homeless program, because they had no money, relatives, or any other place to stay.

The DHS on January 10, 1989, rented an apartment for the family, and continued to assist them with food, diapers, medicine and clothing. However, Mrs. M. left the apartment without notifying the landlord or DHS, leaving behind two large boxes of food, a lot of the children's clothing, and substantial damage to the apartment.

Jamie had been diagnosed as having a cyst on his scrotum, and scheduled for surgery on February 15, 1989. However, Betty M. failed to bring the child for the appointment.

Mrs. M. surfaced again on February 16, 1989, when she called DHS to advise that they were once again homeless and that the youngest child (Ike) had been sick and not had anything to drink for seven days. DHS provided immediate medical attention and assigned a DHS volunteer to work with Betty M. to care for the children. Prescriptions were given for the child, but never filled. The family left the Williamson area almost immediately. The family had also apparently been receiving AFDC benefits from the State of Ohio, and Mrs. M. would go there periodically to pick up her check. The D.H.S. would lose contact with her until she needed more assistance.

Therefore, the DHS, on February 16, 1989, filed a petition seeking removal of the three children from the custody of their mother for both physical and medical neglect. The petition also alleged that Steve M. had left the family home. The children were taken into the custody of DHS, and a preliminary hearing was scheduled for February 21, 1989. Although the DHS was forced to give Steve M. notice of the preliminary hearing via publication in a Columbus, Ohio, newspaper, since his whereabouts were unknown, the record does indicate that, by his own admission, he learned of the removal of his children by the DHS in March 1989 in a phone conversation with his sister. A preliminary hearing was conducted on February 21, 1989, and the lower court granted a six-month out-of-home improvement period to Betty M. and Steve M. However, since Steve M. had left the children, his voluntary absence precluded him from taking advantage of this improvement period.

The children were subsequently placed in foster care. Jamie and Timmy were so aggressive and violent that the Mingo County foster parents with whom they were originally placed requested that they be removed from their home. They were then placed in a special needs home [5] in the Charleston, West Virginia, area through a special needs foster placement agency. Ike was successfully placed in a Mingo County foster care home. Brandon was not born until September 5, 1989. The DHS subsequently returned Ike to his mother's physical custody on October 6, 1989. Both Brandon and Ike remained in their mother's custody until the DHS filed an amended petition on February 5, 1990, and took emergency custody [6] of both children on the basis of physical abuse and medical neglect by the mother and failure to provide proper care. In addition to the petition for emergency custody, the DHS filed a second amended petition on behalf of all four children, alleging continuing physical and medical neglect and abuse, and re-alleging that Steve M. had left the

---

**5.** A special needs home, according to the record, provides specialized care and treatment for those children requiring special medical and/or behavioral and emotional attention.

**6.** When the DHS took emergency custody of Brandon and Ike, these two children were also placed in special needs homes in Charleston, West Virginia.

family home and that he had not contacted the West Virginia DHS to inquire about his children.

Specifically, the DHS alleged in the petition for emergency custody that Mrs. M. had left Ike and Brandon with Gail A. on February 1, 1990, with only one can of Similac and four jars of baby food. Mrs. M. dropped the children off at 4:00 p.m. and was to return to pick them up at 9:00 p.m., but failed to return as agreed. Finally, on February 3, 1990, Mrs. A. returned the children to Mrs. M. Mrs. M. reported that she had been too intoxicated to pick up the children. The DHS also alleged other instances where Mrs. M. had left her children with inappropriate care. For instance, on January 6, 1990, the DHS learned that Mrs. M. had left her children overnight with Abby B., an elderly man in a wheelchair. Mrs. M. indicated that she had also left her children in the care of a sixteen-year-old juvenile and one of her male friends. Additionally, on January 31, 1990, Patrolman Dave Tincher reported to the DHS that he had been called to Mrs. M.'s residence on two recent occasions by neighbors who heard a baby crying for several hours. Patrolman Tincher reported that when he answered the calls, Mrs. M. along with a male friend, were intoxicated with beer cans strewn around the bed and he had difficulty waking them. Also, the DHS noted in the petition that Brandon appeared malnourished, weighing only twelve pounds at five months of age.

A hearing was conducted on March 23, 1990, based upon the amended petition. The record reflects that Steve M. did attend the March 23, 1990, hearing and at that time, an evaluation of the father's home in Ohio was ordered for the purpose of possible placement of the children. The respondent, however, did not request an improvement period at that time, nor did he ask to see his children. Although several hearings were scheduled during the fall of 1990, another hearing was not held until January 11, 1991, after several continuances were granted because service of process could not be obtained on the father. During this hearing, the father moved for an improvement period, and the court proceeded to take evidence regarding the motion.

The record before this Court is replete with psychological and medical data concerning the children. First, regarding the younger children Ike and Brandon, the January 11, 1991, testimony of Sherry Wise, a caseworker with the specialized foster care agency, indicated that both Brandon and Ike were special needs cases from the time that they arrived at the home. Ike was suffering from severe asthma and had frequent ear infections. The medical evidence indicated that the child had suffered a partial hearing loss of forty percent in his right ear due to chronic untreated ear infections. Because of these medical problems, extraordinary measures were taken by the foster parents at their own expense. Ike and Brandon's foster mother testified that they added a filtering system to the furnace in their home to help eliminate dust particles. She also stated that they purchased a humidifier and two vaporizers, and removed the carpeting from the boys' bedroom, all to aid their respiratory problems. Wise testified that it had been necessary to take Ike to the hospital approximately thirty times for his medical problems after his initial placement.

Additionally, Ike exhibited behavioral problems, including aggressiveness and hyperactivity requiring medication. Further, both the caseworker and the foster mother's testimony reflected that after his natural father finally decided to visit in August, 1990, Ike suffered substantial deterioration in his progress, demonstrating vastly increased aggressiveness, having problems at his daycare facility (where his foster mother was employed), and suffering nightmares and sleeplessness. After the child's second visit with the father, he again demonstrated aggressive behavior and nightmares. His foster mother's testimony indicated that it took almost two weeks to settle Ike back into his normal behavior pattern. Consequently, Dr. R. Jenee Walker, a child psychiatrist who examined and treated Ike subsequent to the visits with his father, recommended that "because of the severe negative emotional impact visits with his natural father has on

this child, [it is my recommendation] that visits be withheld for the time being." There was, however, no move by DHS to restrict visits with the natural father, but no more were requested.

Further testimony from Sherry Wise regarding Brandon revealed that the child suffers from asthma, chronic untreated ear infections, gastroesophagel reflux disorder and bacterial viral infections all of which had required some forty hospitalizations. There was no psychological evidence offered concerning Brandon.

Next, the behavior reported by Jamie's foster mother after his initial placement in foster care included kicking, hitting, biting and spitting at family members. Jamie told his foster mother, just after his placement in March 1989, that his father had "stomped" him in the groin area and in the head. Jamie also informed his foster parent that he, along with his brother and mother, had hidden from his father because his father had threatened to shoot his mother. Jamie's foster parents also reported excessive sexual acting out by the child, primarily in the form of masturbation out of the norm (e.g. rubbing against furniture and people). Dr. LaRee D. Naviaux, a psychologist, also testified at the January 11, 1991, hearing that Jamie exhibited characteristics of an abused and neglected child, suffered from an adjustment disorder and possibly had an attention deficit disorder.

From a medical standpoint, Jamie had to undergo hydroseal and hernia surgery and dental surgery. Further, at the time of his placement in a special needs foster care home, he also suffered from a rash, thrash and scabies and had many colds and viruses, according to Debbie Wells, a case manager and counselor with the foster care agency.

Dr. Naviaux also diagnosed Timmy as having an adjustment disorder based upon abuse, neglect and sexual abuse. Dr. Naviaux found characteristics of sexual abuse on the basis of the foster parents' reports that Timmy was acting out explicit sexual behavior, including masturbation and rubbing himself up against furniture and people. Timmy was also observed inserting his finger into his rectum. The child would also scream "don't hurt me," when his foster mother attempted to diaper him. Also, the child had indicated on a sentence completion test that "his daddy jumped on Jamie with his boots." She further testified that this child appears to have "no conscience" in that he never felt guilty about things he had done. The doctor indicated that a child of his age exhibiting this characteristic created real concern. The child also liked to play with knives and guns and went through dangerous periods of throwing objects. Timmy also had chronic ear infections and his speech was developmentally delayed, according to Debbie Wells.

Finally, regarding the two visits by the father in August and September of 1990, and the effect of those visits on Jamie and Timmy, negative changes were noted in both of these children's behavior and verbalization. It was noted by the caseworker present during the visits that Mr. M. showed "only superficial interest in the boys ... in that very little interaction occurred." The foster parents of these two boys, James Pauley, testified that the visit affected Timmy the most. Particularly, after the August visit, Timmy became very aggressive and "would talk about himself and say, 'I'm stupid. I'm going to kill somebody or kill myself.'" Additionally, Jamie expressed fear and anxiety prior to one of these visits with his father when he asked a caseworker: "'What will we do if he has his boots? What will we do it he kicks us with his boots? I don't want to see him. I have a stomach ache.'" Dr. Naviaux testified that Jamie and Timmy were fearful of their father as indicated by the regressive behaviors they displayed after visits with him. Dr. Naviaux opined that the father should not be granted an improvement period due to the amount of regression that had taken place in the two children as a result of just the two visits. Dr. Naviaux further testified that Jamie and Timmy had made dramatic improvements in all arenas of their lives since being stabilized in specialized foster care, and recommended both the children continue to live in such a stable environment. Finally, the testimony of Debbie Wells re-

garding Jamie and Timmy included a recommendation that "the children not be placed back with their biological parents because we [the agency] have not seen them [the natural parents] work with the children to alleviate any of their fears or provide for any of their needs." Clearly, these were children with special problems and special needs.

The evidence offered by the respondent father included his own testimony and that of Kathy C., the woman with whom he was residing. Steve M. testified that he loves his kids and that he wants custody of them. He testified that while he did have problems with his wife Betty M. and admitted that he had hit her, he testified that he has not shown any violence toward Ms. C. or her four children who resided with them. His testimony also revealed that he was arrested for driving under the influence at a time subsequent to when he claimed to have given up alcohol totally.

Additional evidence offered by the respondent included two reports from Franklin County (Ohio) Children Services which performed a home study at the request of the DHS. Even though Steve M. contends that the home studies were somewhat favorable to him and Kathy C., it is significant to note that information contained therein reflects several concerns.

In the first report, dated May 8, 1990, Steve M. admitted to having been a heavy drinker, but denied any continued alcohol use. Yet according to the second report, dated November 30, 1990, he had "recently lost his driver's license for 45 days due to an arrest while driving under the influence of alcohol and reports he spent five days in the county jail for reckless driving."

Also in that second report, the social worker indicated concern that despite having not been ordered to pay any child sup-

port, Steve M. had neither called, written, nor visited his children. The home was approved with reservations "due to the special needs of the children and father's ability to distance himself from his children."

The Franklin County Children Services agency further recommended that, if the children were to be placed in the home, it be done gradually.[7]

At the end of the hearing[8] the trial court rendered the following decision:

> I'm going to rule at this time on the motion for an improvement period. I'm going to grant an improvement period to the father in this case.
>
> . . . .
>
> In this case, I am unable to find compelling circumstances to justify denying the natural father the chance to see if he is able to be a father to these children. This man has never really had a chance, absent the presence of the natural mother, to try to be a parent to these children.

It is from this decision that the children bring this petition for a writ of prohibition.

## IMPROVEMENT PERIODS

The law in West Virginia is clear that in child neglect and abuse proceedings

> the parents or custodians may, prior to final hearing, move to be allowed an improvement period of three to twelve months in order to remedy the circumstances or alleged circumstances upon which the proceeding is based. *The court shall allow one such improvement period unless it finds compelling circumstances to justify a denial thereof,* but may require temporary custody in the state department or other agency during the improvement period.

W.Va.Code § 49–6–2(b) (1984) (emphasis added). This code provision makes it clear that such an improvement period must be

---

7. A third report on the father's home was received by the lower court subsequent to the ruling at issue here, and was included in the record on appeal. The lower court relies heavily on the third report as bolstering the correctness of its ruling. The third report was very brief and outlined the Ohio agency's visits to the home in Columbus, Ohio, during the ten-day period the subject children were there. The gist of the report was that all appeared to be going well during the visits.

8. It is significant to note that the lower court refused to allow the guardian ad litem to finish presenting all her evidence in the case, but instead permitted an avowal which was not considered by the court.

granted "unless the court finds compelling circumstances to justify a denial." Syl.Pt. 2, in part, *State ex rel. Dept. of Human Serv. v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987); *accord* Syl.Pt. 2, *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989).

■ However, we have also previously held that

'courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements.'

Syl.Pt. 1, in part, *In re Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985) (quoting Syl.Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)).

We have also previously upheld the termination of parental rights without an improvement period where the evidence indicated potential danger to the children's welfare had they been returned home. *State v. C.N.S.*, 173 W.Va. 650, 319 S.E.2d 775, 779 (1984). This conclusion was reached in *C.N.S.* as a result of evidence which indicated that the children had suffered from improper feeding habits causing their hospitalization, as well as improper supervision and discipline of the children. 173 W.Va. at 653, 319 S.E.2d at 777; *see In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (Court upheld denial of improvement period where evidence indicated that parents had starved child and parents had deliberately missed child's doctor appointments and concealed themselves from Department of Welfare). We also upheld the denial of an improvement period in the case of *In re Darla B.*, 175 W.Va. at 139–40, 331 S.E.2d at 870–71,

where the evidence indicated that the parents had inflicted such serious life-threatening injuries upon the child that termination was the only reasonable course of action.

In examining other grounds which would justify the denial of an improvement period, we turn to our decision in *Nancy Viola R. v. Randolph W.*, 177 W.Va. 710, 356 S.E.2d 464 (1987). In *Nancy Viola R.*, this Court ordered that the parental rights of a child's natural father be terminated where there was evidence before the court that the father had habitually abused alcohol, had continually been absent from the home, had not provided his family with adequate support and had abused his spouse.[9] 177 W.Va. at 713–14, 356 S.E.2d at 467–68. *See also State v. C.N.S.*, 173 W.Va. 651, 319 S.E.2d 775; *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114.

In the present case, it is significant to note that an improvement period was granted to both the mother and father, although obviously the father's voluntary absence prevented him from benefitting from it. Moreover, not only had the father simply walked out on his wife and children, but he evinced no interest whatsoever in the children until some fifteen months later in March of 1990, despite the fact that, by his own admission, he learned of their taking in March 1989. The evidence showed that the respondent did not actually visit or have any contact with his children until August 20, 1990, almost two years after he left them. Further, during this two-year absence from his children's lives, he made no effort whatsoever to lend any financial or emotional support. It is difficult to perceive a more compelling set of circumstances to justify the denial of an improvement period.

The tender ages of these children must also be considered. As we pointed out in *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991) (citing White, *The First Three Years of Life* at v., (1985)), the experiences of the first three years of a child's life form the foundation for all his later development. *Id.*

<hr />

**9.** The natural father was indicted for the murder of his wife and was ultimately convicted and sentenced to life imprisonment without a

recommendation of mercy. *Nancy Viola R.*, 177 W.Va. at 714, 356 S.E.2d at 468.

■ Consequently, we hold that the abandonment of a child by a parent constitutes compelling circumstances sufficient to justify the denial of an improvement period.

## TERMINATION

■ The circuit court was presented with a plethora of evidence that these four small children were severely and profoundly abused and neglected during their most crucial and formative years. This was clearly proven not only through direct and unrefuted evidence, but also by the reports and testimony of psychiatrists, psychologists, and social workers along with the children's current foster parents. Not one of the individuals who either testified or submitted a report recommended that it would be in any of the children's best interest to be placed in the respondent's custody for an improvement period. As a matter of fact, there was compelling evidence introduced from one of the psychiatrists recommending that Ike not even have visitation with the father due to the extent of the negative impact from the previous visits with the respondent father on that child.

We have indicated that the focus of child abuse and neglect proceedings must be what is in the child's best interest and welfare. *See* Syl.Pt. 1, in part, *In re Darla B.*, 175 W.Va. 137, 331 S.E.2d 868; *see also* W.Va.Code § 49–6–5. It becomes apparent, however, that in this case, the lower court was attempting to exhaust "every speculative possibility of parental improvement" before making a determination of whether to terminate parental rights. *See* Syl.Pt. 1, in part, *In re Darla B.*, 175 W.Va. 137, 331 S.E.2d 868. This is evidenced by the trial court's ruling as follows:

If Mr. M. is given an improvement period, it may not even be necessary to terminate the parental rights of the natural mother. If we proceed to the conclusion of this hearing today, I would have to tell you, frankly, that I've heard enough evidence to where I think it would probably warrant terminating her parental rights. If it was a question of giving her the children or terminating her parental

rights, there's grounds to terminate her parental rights. If the children can be given to the father, and if that will work, then it is not necessary to terminate the mother's parental rights. So, this improvement period, if it is successful, might and probably will prevent the harsh remedy of terminating the natural mother's parental rights.... If the improvement period is not granted, the only remedy left open to me today is to terminate the parental rights of both sets of parents.

Furthermore, the lower court has overlooked the law in this jurisdiction which stresses the protection of the parent and child relationship, but " 'recognizes that the right of the natural parent to the custody of his child is not absolute ... [but] limited and qualified by the fitness of the parent to honor the trust of the guardianship and custody of the child.' " *In re Darla B.*, 175 W.Va. at 139, 331 S.E.2d at 870 (quoting *In re Willis*, 157 W.Va. 225, 237, 207 S.E.2d 129, 137 (1973)).

The standard for determining the fitness of a parent to maintain custody of his child was recently reiterated in syllabus point 1 of *Nancy Viola R.*, 177 W.Va. 710, 356 S.E.2d 464. We stated the following:

A parent has the natural right to the custody of his or her infant child, and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts. Syllabus, *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d [798] (1969). Syl. pt. 2, *Hammack v. Wise*, 158 W.Va. 343, 211 S.E.2d 118 (1975).

*Id.*

Additionally, W.Va.Code §§ 49–6–5(a)(6), (b)(1), (b)(3), (b)(4), and (b)(5) (1988) which provide for the disposition of neglected or abused children specifically state that:

Upon a finding that there is no reasonable likelihood that the conditions of ne-

glect or abuse can be substantially corrected in the near future, and when necessary for the welfare of the child, [the court can] terminate the parental or custodial rights and responsibilities.... Such conditions shall be deemed to exist in the following circumstances, which shall not be exclusive:

(1) The abusing parent or parents have habitually abused or are addicted to alcohol, controlled substances or drugs, to the extent that proper parenting skills have been seriously impaired and such abusing parent or parents have not responded to or followed through the recommended and appropriate treatment which could have improved the capacity for adequate parental functioning;

....

(3) The abusing parent or parents have not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare, or life of the child;

(4) The abusing parent or parents have abandoned the child;

(5) The abusing parent or parents have repeatedly or seriously injured the child physically or emotionally, or have sexually abused or sexually exploited the child, and the degree of family stress and the potential for further abuse and neglect are so great as to preclude the use of resources to mitigate or resolve family problems or assist the abusing parent or parents in fulfilling their responsibilities to the child....

Consequently, based upon the evidence presented to the lower court, it is the determination of this Court that the record is abundantly clear that these parents were unfit, and that accordingly, the lower court should have terminated parental rights on the basis of abandonment by the respondent father, and physical and medical neglect and abuse by the natural mother and father, and on the further basis that there is no reasonable likelihood that these conditions of neglect and abuse can be substantially corrected in the near future.

## TRANSFER OF PHYSICAL CUSTODY

An ancillary matter that bears discussion is the manner in which the physical custody of the children was transferred to the father. At the time the circuit court ordered the transfer of the children, Brandon was one year old, Ike was three years old, Timmy was four years old, and Jamie was five years old. Except for the two visits in August and September 1990, none of the children had any contact with the father for almost two years. Despite the guardian ad litem's protestations and request for a stay from Friday afternoon until the following Monday, the court directed that Timmy and Jamie be turned over to the father that evening and that Ike and Brandon be turned over to the father within thirty days.

The lower court virtually ignored the extensive evidence regarding the children's fear of their father and their special needs for stability and consistency. Even the Franklin County Children Services recommended that any transfer in custody to the respondent father occur gradually due to the special needs of the children, as well as the fact that the father and his companion already had her four children in their care. Consequently, it is beyond comprehension as to why the lower court ordered that two of the children be surrendered to the respondent father on the night of the hearing with denial of even a three-day stay.

As we noted in *Honaker v. Burnside*, 182 W.Va. 448, 452–453; 388 S.E.2d 322, 326 (1989) in upholding a gradual transition from the step-father to the natural father, it is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians.[10]

---

**10.** The *Honaker* case dealt with two fit and proper parties, with no allegation whatsoever of abuse and neglect, and even there we found the lower court was correct in directing a gradual transition. 182 W.Va. at 452–453, 388 S.E.2d at 326.

Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods "should be developed in a manner intended to foster the emotional adjustment of ... [the] children to this change ..." and to maintain as much stability as possible in their lives. *Honaker,* 182 W.Va. at 453, 388 S.E.2d at 326. These same principles may apply whenever a child is to be removed from the custody of anyone with whom he has formed an important attachment. *See* Hegar, *Foster Children's and Parents' Rights to a Family,* Soc.Serv.Rev., Sept.1983, 429.

## CHILDREN'S RIGHT OF ASSOCIATION

It is also important to address the rights of these children to continued association amongst themselves as siblings. The guardian ad litem indicated during oral argument that these children will more than likely remain in long-term or permanent foster care, hopefully in the homes where they have resided since being placed in special needs foster care, wherein they have made such good progress. Also, according to the guardian ad litem, the DHS and the foster families have worked to maintain contact among the children, and every effort should be made to continue their familial connection.

■ In *Honaker,* we recognized that a child's best interests must be the primary standard by which his rights to continued contact with other significant figures in his life are to be determined. 182 W.Va. at 452–453, 388 S.E.2d at 326. Certainly in a case wherein children, by virtue of termination of parental rights, are losing their biological parents, all efforts should be made to preserve their rights to a continued relationship with their only other immediate family blood relatives.

■ Trends both in social work and the law relating to child placement indicate an increased awareness of children's rights to such continued association with siblings and other meaningful figures. *See generally,* Hegar, *Legal and Social Work Approaches to Sibling Separation in Foster Care,* 67 Child Welfare 113 (1988); Reddick, Juv.Just., Nov. 1974, 31–32. The increased professional emphasis in social work on the sibling relationship is consistent with the broadening focus of the literature about separation. Hegar, *supra,* 67 Child Welfare at 113. The growing legal emphasis on the best interests of the child as the primary criterion for child placement decisions facilitates efforts to preserve stable relationships for children. Hegar, *supra,* Soc.Serv.Rev., Sept., 1983, at 429; *see also* Note, *Visitation Beyond the Traditional Limitations,* 60 Ind.L.J. 191 (1984).

Because sibling relationships often become more meaningful for brothers and sisters when they are permanently separated from their mothers and fathers, there is a growing judicial recognition of sibling rights in other jurisdictions. *See id.*

"[I]n a 1977 New York case, a child-placing agency was ordered by the court to present a plan for integrating a brother into the lives of sisters in a different placement, despite the brother having been separated from his sisters for seven years. The opinion note[d] that 'in the final analysis when these children become adults, they will have only each other to depend on.'" Hegar, *supra,* 67 Child Welfare at 117–18 (quoting *In re Patricia Ann W.,* 89 Misc.2d 368, 379, 392 N.Y.S.2d 180, 187 (1977)).

In *In re Elizabeth M.,* 232 Cal.App.3d 553, 283 Cal.Rptr. 483 (1991), wherein parental rights were terminated because of abuse and neglect, the court concluded that the statutory scheme which required the court to consider the best interests of the child in such proceedings included an implicit requirement that the court consider whether continuing sibling visitation is in the child's best interests.

As stated in *Honaker,* the best interests of the child concept with regard to visitation emerges from the reality that " '[t]he modern child is considered a person, not a sub-person over whom the parent has an absolute and irrevocable possessory right. The child has rights....'" 182 W.Va. at 452, 388 S.E.2d at 326 (quoting Note, *supra,* at 221 (footnote omitted)). Therefore, in the present case, we direct the court the DHS and any permanent families or custo-

dians involved in these children's lives to make every effort to facilitate the children's continued association with one another.

In doing so, we follow *Honaker* and adopt the reasoning of the New York and California courts in determining that in cases where there is a termination of parental rights, the circuit court should consider whether continued association with siblings in other placements is in the child's best interests, and if such continued association is in such child's best interests, the court should enter an appropriate order to preserve the rights of siblings to continued contact.

## ROLE OF GUARDIAN AD LITEM

 Finally, in *State v. Scritchfield*, 167 W.Va. 683, 688–89, 280 S.E.2d 315, 319 (1981) we recognized that in neglect and abuse proceedings the child has the right to be represented by an attorney at all stages of the proceedings, including any appeal. *See* Syl. Pt. 3, *In re Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214, 220 (1991) (guardian ad litem's duty to exercise reasonable diligence in protecting rights of children *includes* exercising appellant rights of children). Likewise, a child has a right to continued legal representation pursuant to W.Va.Code § 49-6-8, *Scritchfield* and *In re Scottie D.*, until such time as he is adopted or placed in permanent foster care.

Specifically, West Virginia Code §§ 49–6–8(a) and (b) mandate a twelve-month review by the court after the state department has received the child where no permanent placement has been made. Further, the statute requires the state department to file with the lower court a petition for review of the case and a report detailing all efforts to place the child in a permanent home. The court then must conduct a hearing to review the child's case, determine what efforts are necessary to provide the child with a permanent home and what services are required to meet the child's needs, and otherwise determine what is in the child's best interest. The statute requires a supplemental review of the child's case within eighteen months and every eighteen months thereafter until the child has a permanent placement.

Thus, the guardian ad litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home.

Based upon the foregoing opinion, we hereby reverse the lower court's granting of an improvement period to the respondent father and further direct the lower court to issue a ruling in this matter consistent with this opinion.

Writ granted as moulded.