IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2020 Term

_____

No. 19-0921

_____

**FILED**
**November 12, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE B.A.

_____

Appeal from the Circuit Court of Wood County
The Honorable Jason A. Wharton, Judge
Case No. 18-JA-160

REVERSED AND REMANDED WITH DIRECTIONS

_____

Submitted: September 2, 2020
Filed: November 12, 2020

William B. Summers, Esq.
Summers & Associates
Parkersburg, West Virginia
Counsel for Petitioners

Patrick Morrissey, Esq.
Attorney General
Thomas J. Lampman, Esq.
Assistant Attorney General
Mindy M. Parsley, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent Department of
Health and Human Resources

Debra Steed, Esq.
Law Office of Debra L. Steed
Parkersburg, West Virginia
Guardian ad Litem

JUSTICE WALKER delivered the Opinion of the Court.

CHIEF JUSTICE ARMSTEAD dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1.       "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syllabus Point 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.       "W.Va. Code § [49-4-111(e) (2015)] provides for a 'sibling preference' wherein the West Virginia Department of Health and Human Resources is to place a child who is in the department's custody with the foster or adoptive parent(s) of the child's sibling or siblings, where the foster or adoptive parents seek the care and custody of the child, and the department determines (1) the fitness of the persons seeking to enter into a foster care or adoption arrangement which would unite or reunite the siblings, *and* (2) placement of the child with his or her siblings is in the best interests of the children. In

any proceeding brought by the department to maintain separation of siblings, such separation may be ordered only if the circuit court determines that clear and convincing evidence supports the department's determination. Upon review by the circuit court of the department's determination to unite a child with his or her siblings, such determination shall be disregarded *only* where the circuit court finds, by clear and convincing evidence, that the persons with whom the department seeks to place the child are unfit *or* that placement of the child with his or her siblings is not in the best interests of one or all of the children." Syllabus Point 4, *In re Carol B.*, 209 W. Va. 658, 550 S.E.2d 636 (2001).

WALKER, Justice:

Shortly after the child B.A. was born, he was removed from the custody of his parents and placed in the foster care of Petitioners M.B. and C.B., who had already adopted B.A.'s older sibling.[1]  A few months later, the Guardian ad Litem appointed to represent B.A. investigated Petitioners' finances and discovered a significant number of liens and judgments against them as well as over $46,000 in unpaid child support.  But Petitioners contend that the Guardian's investigation was in retaliation for them filing a complaint against her for neglecting her duties.  Nonetheless, the circuit court relied upon the Guardian's findings, concluded that they would not be fit to adopt B.A. under West Virginia Code § 48-22-701(d) (2001), and removed B.A. from their custody.  On appeal, Petitioners contend that the Guardian acted vindictively and the circuit court ignored the fact that they had adopted B.A.'s sibling.  While the circuit court's consideration of Petitioners' finances in this context was appropriate, we remand for a full analysis of these facts within the framework of the sibling preference outlined in West Virginia Code § 49-4-111(e) (2015) and our holding in *In re Carol B.*, 209 W. Va. 658, 550 S.E.2d 636 (2001).

---

[1]  Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013).

1

## I. Factual and Procedural Background

The Department of Health and Human Resources (DHHR) removed B.A. from the custody of his parents shortly after his birth and then placed B.A. in the foster care of Petitioners M.B. and C.B. because they had adopted B.A.'s older sibling at the conclusion of an earlier abuse and neglect proceeding.[2] When B.A. was placed with Petitioners in October 2018, there were five other children living in the home: three of Petitioners' biological children, B.A.'s older sibling, and another foster child. DHHR approved the foster placement, and the permanency plan for B.A. was adoption with Petitioners.

In October 2018, the circuit court assigned a Guardian ad Litem (Guardian) to advocate for B.A.'s interests. Petitioners allege that they lodged a complaint with a guardian ad litem coordinator in early 2019 because the Guardian for B.A. had never been to visit them or the child since her assignment in October 2018. They also contend that they sought a replacement guardian because they felt the Guardian was not fulfilling her duties. But, the Guardian was not removed from the case.

Next, Petitioners allege the Guardian began an unnecessary and vindictive search into their financial background in retaliation for filing the complaint against her. The Guardian responds that her in-depth search was not prompted by any sort of vendetta

---

[2] Like his sibling, B.A. was removed from his parents' custody due to allegations of abuse and neglect.

against Petitioners. She states that in the normal course of her investigation to generate a report for the circuit court in the abuse and neglect proceedings, she discovered that Petitioners had failed to notify her or the DHHR of a pending felony charge of fraudulent schemes against M.B. and that charge prompted a more thorough look into Petitioners' background.

The Guardian's search uncovered liens and judgments against M.B.'s contracting business as well as personal judgments against M.B. and C.B. for unpaid babysitting services. Those liens and judgments, both personal and business, amounted to over $65,000. As to M.B.'s criminal background, the Guardian noted a 2003 public intoxication charge for which he was found not guilty; a 2003 charge for reckless driving for which he was found guilty; a 2003 charge of driving under the influence, which was dismissed; a 2009 charge for violating a protective order, which was dismissed; a 2010 charge for failure to pay child support for which no disposition was indicated; a 2018 charge for obtaining money by false pretenses for which no disposition was indicated; and a 2019 felony charge for fraudulent schemes for which no disposition was indicated.

The Guardian filed a status report in late March 2019 recommending that the child be removed from Petitioners' custody due to those financial and legal issues. And, the Guardian expressed concern that Petitioners had neglected to inform her or the DHHR of the recent fraudulent schemes charge and had failed to disclose the biological child for

3

whom M.B. owed the child support arrearages.[3]  As a result of those issues uncovered by the Guardian, she claimed that Petitioners would be unable to adopt the child for failure to meet the "good moral character" requirements of West Virginia Code § 48-22-701 and, for that reason, recommended that the child be removed from their custody.[4]  Shortly after the Guardian made her recommendation to remove the child from their custody, Petitioners filed a Lawyer Disciplinary Board (LDB) complaint against the Guardian.

Although the Guardian's status report recommended that the child be removed from Petitioners' home, she never filed a motion to remove the child.  Petitioners, rather, filed a "Motion for Placement to Continue With Foster Placement" in which Petitioners noted the preference for keeping siblings together under West Virginia Code § 49-4-111(e), explained that the child was meeting all milestones for child development, and aired their grievances as to what they believed was an unethical search into their financial background.

---

[3] It appears from the record that the Guardian made this argument based on the charge for failure to pay child support and that the circuit court ordered the DHHR to more thoroughly investigate the child support order and to forward those findings to the Guardian.

[4] West Virginia Code § 48-22-701(d) requires that, before approving an adoption, the circuit court should find that the prospective adoptive parents are "of good moral character, and of respectable standing in the community, and are able properly to maintain and educate the child sought to be adopted, and that the best interests of the child would be promoted by such adoption[.]"

4

Two days later, the Guardian filed her report for the dispositional hearing in the pending abuse and neglect proceeding against B.A.'s biological parents. In that report, she reiterated the concerns raised in her March 2019 status report. The Guardian likewise reported that a review of Petitioners' tax returns reflected nearly $16,000 in gambling income, and that the child support records for M.B.'s other biological child indicated that the child support obligation was terminated at the request of the mother in November 2016, after the child became emancipated. She further reported that there was an arrearage balance of $46,136.34.[5]

The circuit court held a hearing on Petitioners' "Motion for Placement to Continue With Foster Placement." Petitioners were permitted the opportunity and right to be heard, but not the right to present or to cross-examine witnesses.[6] The Guardian presented her findings and stated, "[i]t's not that I don't think that the child is safe in their home. It's that I don't think this is a home for permanent placement. I would be concerned about a child's financial future." The DHHR explained that at the previous hearing, the

---

[5] *See supra* n.3

[6] Petitioners expressed concern at oral argument that they were not provided the opportunity to present and cross-examine witnesses so as to fully explain the circumstances of all of the grounds laid against them as cause for removal, particularly the child support arrearages. But, during the hearing, the circuit court specifically noted that the scope of Petitioners' rights was limited to the opportunity to be heard and Petitioners' counsel agreed. *See* Syl. Pt. 4, *State ex rel. C.H. v. Faircloth*, 240 W. Va. 729, 815 S.E.2d 540 (2018). To the extent Petitioners take issue with the scope of their rights during this proceeding, we find that it has been waived.

DHHR was in support of the child remaining with Petitioners. But, the DHHR noted that it had investigated the child support arrearages and found that the only reasons the failure to pay child support charges were not pursued was because the mother "did not want to deal with it" and the child became emancipated. Given the child support arrearages and the implications of gambling income, the DHHR had concerns that the Petitioners would not be able to meet all of the requirements to adopt B.A. and that the child would inevitably have to be moved elsewhere. So, the DHHR changed its position and supported removing the child.

Petitioners argued that the level of financial scrutiny they were subjected to was unprecedented and had become the focus of the proceedings. They further argued that whatever relevance their financial health might have in the later adoption proceedings, these judgments and criminal proceedings are individual incidents that have either been resolved or are being resolved, and are not indicative of financial instability as a whole.

The circuit court took particular issue with M.B.'s failure to pay child support despite his ability to do so, finding that it was only partly a financial issue, but more importantly, a moral one. In its September 5, 2019 order, the circuit court directed the department to remove the child from Petitioners' custody and place him with another foster family,[7] finding that Petitioners would not meet the prerequisites to adopt the child under

---

[7] The appendix does not include any subsequent reference to placing B.A. with a new foster family, specifically, whether there was a gradual transition from Petitioners'

6

West Virginia Code § 48-22-701(d). Specifically, the circuit court based its decision on the $65,000 in judgments against Petitioners, and M.B.'s failure "to financially support a child that he has acknowledged as his." The circuit court concluded that such knowing failure despite the financial ability to do so rendered Petitioners unable to meet the morality prerequisites to adopt B.A. and another foster placement would be in B.A.'s best interests. It is from that order that Petitioners appeal.

## II.  Standard of Review

Our review in abuse and neglect proceedings is guided by a deferential standard:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing

custody. We remind the circuit court that, whenever possible, it should provide for a gradual transition, especially for children as young as B.A.:

> It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially when young children are involved. Further, such gradual transition period should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.

Syl. Pt. 4, *In re Hunter H.*, 227 W. Va. 699, 715 S.E.2d 397 (2011) (quoting syl. pt. 3, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991)).

court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.[8]

## III. Discussion

Petitioners contend on appeal that the Guardian subjected them to unnecessary financial scrutiny, and that the circuit court erred in removing the child from their custody on those grounds although the child was doing well in the placement with his sibling.

Beginning with the contention that the Guardian pursued an ill-intended investigation into Petitioners' finances, initially we observe that unlike many foster parents, Petitioners' financial background was more available as a matter of public record due to the simple fact that M.B. owns a contracting business. And, while we do not endorse the alleged motives for and methods of the Guardian's investigation, the question of whether the Guardian violated her professional responsibilities is one best resolved by the LDB. The parties indicated at oral argument that the LDB had dismissed Petitioners' complaint and was not pursuing any action against the Guardian. So, we concern ourselves not with the means by which the information was obtained, but what we glean from that information

---

[8] Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

as far as it affects the best interests of the child and Petitioners' ability to adopt B.A. under the requirements of West Virginia Code § 48-22-701(d).

West Virginia Code § 48-22-701(d) outlines how a court must scrutinize the prospective adoptive parents before approving an adoption:

> the court or judge thereof [must be] satisfied that the petitioner is, or the petitioners are, of good moral character, and of respectable standing in the community, and are able properly to maintain and educate the child to be adopted, and that the best interests of the child would be promoted by such adoption[.]

We agree with the circuit court here that the finances of prospective adoptive parents may be considered as part of the analysis under this code section. Even Petitioners recognized below that it is a relevant inquiry, but they take issue with the extent to which their finances became the sole focus of the proceedings. A review of the circuit court's order and the transcript of the proceedings indicates that it was not Petitioners' financial woes alone that led the circuit court to believe they could not meet the prerequisites to adopt B.A., but it was more so the moral implications of M.B.'s failure to pay child support for a child he recognized as his as well as the effect Petitioners' debts might have on the best interests of B.A.[9]

---

[9] We note that despite M.B.'s criminal history and pending felony charge, it does not appear that the circuit court based its finding that Petitioners would be unable to demonstrate they were of good moral character on M.B.'s unlawful conduct. DHHR also did not appear to take issue with M.B.'s criminal history below, perhaps because it was receiving assurances that the recent charges were being dismissed upon repayment to the

Specifically, the majority of the proceeding below revolved around the significant child support arrearages, which the circuit court addressed by stating "[i]t is only in part financial. The lack of supporting your own child is a moral obligation." That point is underscored when we examine Petitioners' contention that the circuit court unjustly held their gambling income against them when gambling is a lawful activity in West Virginia. While DHHR and the Guardian voiced concerns about the gambling income as far as it shed light on where Petitioners' money was going, the circuit court made no mention of the gambling income as a basis for its decision in its order. The apparent relevance of Petitioners' gambling income to the circuit court's analysis is outlined in the transcript, where the circuit court asked Petitioners how they defend the complete lack of supporting his child, noted the $46,000 in arrearages and stated "[h]e won $16,000 last year[,] and he did not use it to take care of his obligations as a biological father."

Likewise, Petitioners' other debts are considered not only in the context of Petitioners' ability to provide financially for the child, but also relate to how those debts will affect the child's best interests. While Petitioners averred that the judgments and liens against them had not *yet* affected their children or B.A., the circuit court heard testimony that Petitioners were selling their home in order to use the proceeds to settle debts. So, while the circuit court's analysis did consider Petitioners' ability to care for the child, their

victims. At oral argument, Petitioners' counsel indicated that M.B.'s felony charge of fraudulent schemes was still pending.

10

financial health implicated broader concerns about the best interests of the child and the moral obligation to pay child support. So, we disagree that the circuit court inappropriately considered Petitioners' finances in the context of a determination under West Virginia Code § 48-22-701(d).

But, we do find error in the circuit court's apparent failure to place *any* weight on Petitioners' adoption of B.A.'s sibling, and that this home with Petitioners, where his sibling resides, is the only home he has ever known. A preference for placing siblings together is specified in West Virginia Code § 49-4-111(e) (2015).[10] In *In re Carol B*,[11] we discussed the practical application of the sibling preference and held, in Syllabus point 4, as follows:

> W.Va. Code § [49-4-111(e) (2015)] provides for a "sibling preference" wherein the West Virginia Department of Health and Human Resources is to place a child who is in the

---

[10] Petitioners cite West Virginia Code § 49-2-14(e), which was recodified at West Virginia Code § 49-4-111 in 2015. That code provision states in pertinent part, at subsection (e)(1):

When a child is in a foster care arrangement and is residing separately from a sibling or siblings who are in another foster home or who have been adopted by another family and the parents with whom the placed or adopted sibling or siblings reside have made application to the department to establish an intent to adopt or to enter into a foster care arrangement regarding a child so that the child may be united or reunited with a sibling or siblings, the department shall, upon a determination of the fitness of the persons and household seeking to enter into a foster care arrangement or seek an adoption which would unite or reunite siblings, and if termination and new placement are in the best interests of the children, terminate the foster care arrangement and place the child in the household with the sibling or siblings.

[11] 209 W. Va. 658, 550 S.E.2d 636 (2001).

department's custody with the foster or adoptive parent(s) of the child's sibling or siblings, where the foster or adoptive parents seek the care and custody of the child, and the department determines (1) the fitness of the persons seeking to enter into a foster care or adoption arrangement which would unite or reunite the siblings, *and* (2) placement of the child with his or her siblings is in the best interests of the children. In any proceeding brought by the department to maintain separation of siblings, such separation may be ordered only if the circuit court determines that clear and convincing evidence supports the department's determination. Upon review by the circuit court of the department's determination to unite a child with his or her siblings, such determination shall be disregarded *only* where the circuit court finds, by clear and convincing evidence, that the persons with whom the department seeks to place the child are unfit *or* that placement of the child with his or her siblings is not in the best interests of one or all of the children.[12]

Petitioners raised the sibling preference in their motion to maintain placement and advocated at the hearing, generally, that they had adopted B.A.'s sibling, which needed to be afforded due consideration. The Guardian offhandedly during the hearing stated, "*[g]ranted he has a bond*, he has a full-blooded sibling there[,]"[13] but the hearing transcript and order are otherwise devoid of any discussion of B.A.'s sibling, much less whether the separation of siblings is supported by clear and convincing evidence. While DHHR argues that the preference is not absolute and is tempered against the best interests of the children, we are troubled by the absence of findings relating to the sibling bond or lack thereof and how Petitioners' adoption of B.A.'s sibling affects the overarching

---

[12] 209 W. Va. 658, 664, 550 S.E.2d 636, 644 (2001).

[13] Emphasis added.

12

analysis of the best interests of the child. Although the best interests of the child are always of paramount concern, West Virginia Code § 49-4-111(e) requires that the best interests analysis incorporate consideration of the effects of sibling separation, and that simply was not done here. So, we remand for the circuit court to perform a best interests analysis making detailed consideration of the sibling preference and appropriate findings to that end.

## IV. Conclusion

For these reasons, we reverse and remand with directions for the circuit court to analyze the sibling separation statute in assessing whether B.A.'s best interests are furthered by placement with Petitioners. The circuit court is directed to hold a hearing within ten days, and is further directed to facilitate supervised visitation with Petitioners during the pendency of remand. The Clerk of this Court is directed to issue the mandate contemporaneously with this opinion.

Reversed and remanded with directions.