**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **B.P.**

**No. 25-348** (Wood County CC-54-2022-JA-190)

**MEMORANDUM DECISION**

Petitioner Father C.N.[1] appeals the Circuit Court of Wood County's May 1, 2025, order terminating his parental, custodial, and guardianship rights to B.P., arguing that the court erred in finding that he had abandoned the child and in terminating his parental rights.[2] Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

Prior to the petitioner's involvement in the proceedings, the DHS filed an initial petition in July 2022, shortly after B.P.'s birth, listing the child's father as unknown and alleging abusive and/or neglectful conduct by the mother.[3] The DHS later amended the petition to include allegations of abandonment against the unknown father, and the unknown father was served by publication. Child Protective Services' ("CPS") initial attempts to contact the petitioner in April 2024 were unsuccessful; however, the DHS filed a report in July 2024 stating that a CPS worker had finally reached the petitioner. The court ordered paternity testing in August 2024, and the results indicated that the petitioner was B.P.'s father.[4]

The DHS filed a second amended petition in November 2024, alleging that the petitioner had demonstrated the settled purpose to forego his parental duties and responsibilities and had not

---

[1] The petitioner appears by counsel Jeffrey B. Reed. The Department of Human Services ("DHS") appears by counsel Attorney General John B. McCuskey and Assistant Attorney General Katica Ribel. Counsel Michael D. Farnsworth Jr. appears as the child's guardian ad litem ("guardian").

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

[3] At a subsequent hearing in September 2022, the mother provided the names of four men who might have fathered the child, including the petitioner. The mother testified that she did not have contact information for these men but indicated that each might be reached through social media and related the areas in which she believed they resided.

[4] The court subsequently entered an order, based on these test results, finding that the petitioner was B.P.'s biological father.

1

provided the child with financial, educational, or emotional support. The DHS alleged that when the petitioner first spoke to a CPS worker, he admitted to having a prior relationship with the mother but indicated he did not want to become involved in the proceedings because she was "crazy." He was equivocal about the timing of their liaison and did not believe he had fathered B.P., though he agreed to paternity testing. The DHS further alleged that the petitioner had informed another caseworker that he knew of the mother's pregnancy and that he was possibly the father.

At an adjudicatory hearing in December 2024, the court heard testimony from the petitioner, who admitted that the mother lived with him for a short time while they were in a relationship until he "started noticing [signs of the mother's] mental illness." The petitioner then ended the relationship but continued to speak with the mother on occasion and knew where she lived. The petitioner admitted that the mother told him she was pregnant in January or February of 2022 and that he was one of several potential fathers, though he claimed that he believed he was sterile at that time. The petitioner also related how he once "pursued" disputing another woman's paternity claim and took "a DNA test" to show "it was zero percent my kid." However, the petitioner learned that he was *not* sterile in June or July of 2022 when his subsequent girlfriend told him that she was pregnant. The two were promptly married. The petitioner realized it was possible that he had also fathered a child with B.P.'s mother but made no attempt to contact her, stating that he "had a lot going on"—including that he "was very sick" and "was busy raising [his] own child . . . so it kind of slipped [his] mind." He admitted to receiving initial contact from a CPS worker but stated that he did not respond because he thought the message (sent via social media) was fake. Due to time constraints, the adjudicatory hearing was continued to January 2025, at which time the court heard testimony from one of the child's caseworkers. The caseworker testified that the petitioner had disclosed that "he knew about the birth of the child and that it could be his but he didn't want anything to do with . . . the mother[] because he was married at the time." Several CPS workers then testified to their respective efforts to identify the child's father since the proceedings began.

Based on this evidence, the circuit court found that the petitioner knew that he was potentially the child's father, yet "did not reach out to [the mother] regarding the child" and "chose not to be in the child's life," opting instead, as the petitioner had put it, to parent "his own child"—referring to his child born in wedlock. The court noted that the petitioner was not a credible witness and that the petitioner's claim of experiencing a "terrible illness" did not excuse his failure to "liv[e] up to his parental responsibilities." Ultimately, the court stated that the petitioner "had every opportunity . . . to determine if [B.P.] was [his] child and . . . made a conscious decision not to do that." Accordingly, the court found that the petitioner "demonstrated a [settled] purpose to forego his parental duties and responsibilities and [had] abandoned the child." The court further found "that under the circumstances of abandonment the [DHS] was under no obligation to make [reasonable] efforts" to preserve the family.

In February 2025, the petitioner moved for a post-adjudicatory improvement period, which the circuit court considered, along with disposition, at a hearing in March 2025. The petitioner acknowledged that he had abandoned B.P. and had no bond with the child, admitting that failing to take action was "a huge mistake," as it had been "his duty to make sure that kid was mine" and he "[s]hould have brought [the mother] to court." The petitioner also admitted that, since his

adjudication in January 2025, he had been named as a respondent in a separate abuse and neglect petition regarding his other child. He had recently entered a stipulation in that case and was granted an improvement period. The petitioner desired an improvement period as to B.P. as well, to run concurrently, and testified that he would fully participate. Both the DHS and the guardian opposed the petitioner's request and recommended that the court terminate the petitioner's rights. The DHS and the guardian also noted that the now two-year-old B.P. had spent nearly all of his life in the current placement. Based on this evidence, the court reiterated its findings that the petitioner was not a credible witness and had abandoned B.P., also noting that the petitioner and the child had no relationship or bond. After finding that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future, and "[b]ased upon necessity for the welfare and best interest of the child," the court terminated the petitioner's parental, custodial, and guardianship rights.[5] The petitioner now appeals from this dispositional order.

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). The petitioner asserts that the circuit court erred in finding that he abandoned the child. We disagree. West Virginia Code § 49-1-201 defines "abandonment" in the context of abuse and neglect proceedings as "any conduct that demonstrates the settled purpose to forego the duties and parental responsibilities to the child." At adjudication, the court heard evidence that the petitioner knew the mother had given birth to a child that was possibly his and was aware that he could obtain testing to establish paternity. The court then found that the petitioner purposefully chose *not* to determine whether he was the child's father, concluding that the petitioner's inaction demonstrated his settled purpose to forgo his parental duties and responsibilities. *See In re C.M.-1*, 247 W. Va. 744, 749, 885 S.E.2d 875, 880 (2023) (explaining that a father's failure to "assert[] his parental rights . . . demonstrated a settled purpose to forgo his responsibilities and duties"); *see also In re A.B.*, No. 18-1147, 2019 WL 2452770, at *3 (W. Va. June 12, 2019) (memorandum decision) ("There can be no more definitive proof of a parent's 'settled purpose to forego the duties and parental responsibilities to the child' than a total abdication of any responsibility for the child."). As the court applied the correct standard in concluding that the petitioner abandoned the child, which finding was supported by the evidence including the petitioner's eventual admission, we find no error.[6]

---

[5] The court terminated B.P.'s mother's parental rights following her voluntary relinquishment. The permanency plan for the child is adoption in the current placement.

[6] In a separate assignment of error, the petitioner argues that the circuit court improperly based its finding of abandonment on a non-existent legal obligation—that a male must remain in contact with a woman after sexual relations to determine whether she becomes pregnant. This argument mischaracterizes the circuit court's statements and findings. The court's determination was not premised on whether the petitioner remained in contact with the mother to determine *if* she became pregnant. Instead, the court reached its determination based upon the petitioner's refusal to take any action upon learning that she *was* pregnant—and that he might be the child's father. Based on the evidence presented, the court determined that the petitioner purposefully chose to do nothing, and, therefore, had abandoned the child. As discussed above, the petitioner fails to show that the circuit court erred in making this finding.

Next, the petitioner asserts that the circuit court erred in failing to grant him a post-adjudicatory improvement period and terminating his rights. Pursuant to West Virginia Code § 49-4-610(2)(B), circuit courts may grant an improvement period when a parent "demonstrates, by clear and convincing evidence, that [he] is likely to fully participate." We have also explained that "the granting of an improvement period is within the circuit court's discretion." *In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). When addressing a parent's request for an improvement period after a circuit court has made a finding of abandonment, we have held that "[a]bandonment of a child by a parent[] constitutes compelling circumstances sufficient to justify the denial of an improvement period." Syl. Pt. 2, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991); *see also In re Emily*, 208 W. Va. 325, 336, 540 S.E.2d 542, 553 (2000) (stating that "when the conduct forming the basis of the abuse and/or neglect allegations consists of abandonment, such parental recalcitrance is perceived as so egregious as to warrant the virtually automatic denial of an improvement period"). Because the petitioner's actions constituted abandonment, we find that the circuit court did not abuse its discretion in denying his motion for a post-adjudicatory improvement period.

Moreover, "[t]ermination of parental rights . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood . . . that conditions of neglect or abuse can be substantially corrected." Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011) (quoting Syl. Pt. 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980)); *see also* W. Va. Code § 49-4-604(c)(6). Pursuant to West Virginia Code § 49-4-604(d), there is "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected" when "based upon the evidence before the court, the abusing adult . . . ha[s] demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help." The statute specifies that such a situation exists when a parent "ha[s] abandoned the child." W. Va. Code § 49-4-604(d)(4). Given the circuit court's prior finding of abandonment, it did not err in finding that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected. The court also found, upon ample evidence, that termination was necessary for the child's welfare. Circuit courts are permitted to terminate a parent's rights upon these findings. *See* W. Va. Code § 49-4-604(c)(6) (permitting termination upon findings that "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is "necessary for the welfare of the child").

Finally, the petitioner asserts that the DHS's failure to promptly contact him when the mother first named him as a potential father deprived B.P. of a relationship with him, delayed the child's permanency, and improperly resulted in the termination of his rights. The petitioner further argues that the DHS's unreasonable delay in contacting him runs afoul of this Court's precedent as well as certain statutes and procedural rules. To the contrary, the record indicates that the petitioner's actions prejudiced him, not those of the DHS. As the circuit court noted, while the DHS may have done "a terrible job in trying to find [the petitioner,] . . . the ultimate determination on . . . abandonment comes down to [the petitioner's] actions." In other words, the timeliness of the DHS's paternity investigation does not change the fact that the petitioner knew the mother had given birth to a child that was possibly his and did nothing. It was this choice by the petitioner that deprived the child of a relationship with the petitioner and ultimately resulted in the termination of his rights. Moreover, nothing in the record indicates that the petitioner would have voluntarily

4

come forward had the DHS not pursued him. Regardless, we note that the mother could not initially identify the child's father and later expressed confidence that it was another man. When paternity testing ruled out this putative father in April 2024, the DHS began investigating the other men whom the mother had named. It is undisputed that the petitioner received but did not respond to the CPS worker's initial attempts to contact him through social media. While the identity of the child's father remained uncertain, the DHS served notice of the proceedings by publication pursuant to West Virginia Code § 49-4-601(e)(4) in the areas in which the potential fathers resided according to the mother's testimony at the September 2022 hearing. Under these circumstances, we find that the circuit court was correct in deciding that the termination of the petitioner's parental, custodial, and guardianship rights was not attributable to the DHS's lack of effort or violation of its statutory obligations, but rather was the consequence of petitioner's "settled purpose to forego his duties and parental responsibilities to the child." As such, the petitioner is not entitled to relief.

For the foregoing reasons, we find no error in the decision of the circuit court, and its May 1, 2025, order is affirmed.

Affirmed.

**ISSUED**: March 3, 2026

**CONCURRED IN BY**:

Chief Justice C. Haley Bunn
Justice William R. Wooton
Justice Charles S. Trump IV
Justice Thomas H. Ewing
Justice Gerald M. Titus III