STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS

**FILED**
**April 20, 2021**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **I.H., O.H., and R.H.**

**No. 20-0738** (Berkeley County 19-JA-58, 19-JA-59, and 19-JA-60)

## MEMORANDUM DECISION

Petitioner Custodian J.H., by counsel Dylan K. Batten, appeals the Circuit Court of Berkeley County's July 27, 2020, order terminating his custodial rights to I.H., O.H., and R.H.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Mindy M. Parsley, filed a response in support of the circuit court's order and a supplemental appendix. The guardian ad litem, Mary Binns-Davis ("guardian"), filed a response on behalf of the children also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in adjudicating him as an abusing custodian, withholding evidence, and terminating his custodial rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In April of 2019, the DHHR filed a child abuse and neglect petition against the children's mother, the children's father, and petitioner, who is the children's stepfather. The DHHR alleged that the mother and the children appeared at a local hospital with law enforcement because petitioner was at the home drunk and possessed a firearm. The DHHR further alleged that the mother told law enforcement officers she wanted someone to take temporary custody of I.H., her fourteen-year-old daughter, so she could return home to petitioner with her sons, R.H. and O.H. The DHHR alleged that I.H. disclosed to hospital workers that petitioner was "trying to have sex with her and she [did not] want to." The DHHR alleged that the mother either did not believe the child's accusations or "d[id] believe but [did not] care." According to the petition, a Child

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

Protective Services ("CPS") worker spoke with a registered nurse at the hospital, who corroborated the child's statements. The CPS worker later spoke with a forensic interviewer who confirmed that the mother cancelled I.H.'s forensic interview regarding I.H.'s claim that petitioner was trying to have sex with her. Later that month, the CPS worker spoke with I.H., who disclosed that petitioner "came into her room and touched her privates" on top of her clothing. The child also disclosed that petitioner showed her a video of the mother and him engaging in sexual intercourse. I.H. further disclosed that petitioner asked her if she "wanted to sleep with one of the other orchard workers." I.H. disclosed that on one occasion petitioner told her to "kill her brothers" because they were being loud and fighting with each other; the child also disclosed that she told the mother about this incident. Finally, I.H. reported that she had not spoken to either parent since they returned from the hospital and that she was "scared to leave her room."

According to the petition, the CPS worker also spoke to R.H., who claimed that I.H. was lying and fabricating accusations against petitioner. The child further disclosed that petitioner was "going to kill [I.H.] because of how she is acting," and did not want I.H. in the home. The CPS worker then spoke with the mother, who stated that she did not believe I.H. because "everyone is saying that nothing is going on." The mother further claimed that she believed the child "at first" but then stated that I.H. dressed inappropriately, "with her breasts showing, sit[ting] with her legs open, and ben[t] over so [petitioner] could see her breasts." The DHHR also alleged that the CPS worker spoke with petitioner, who denied all of I.H.'s allegations. After the petition was filed, petitioner waived his preliminary hearing and the circuit court ratified the removal of the children from his custody.

In May of 2019, the CPS worker observed a forensic interview with I.H. The child recounted details of petitioner and the mother drinking alcohol together before petitioner came into her room and touched her inappropriately. The CPS worker noted that I.H. said the mother was asleep when the abuse occurred and that petitioner asked her if she was a virgin, told her he wanted to murder the child's paternal grandmother, and that he had killed people before. The child stated that she was afraid of petitioner and would lock herself in her bedroom when the mother and petitioner consumed alcohol.

The circuit court held an adjudicatory hearing in October of 2019. The mother also testified that, during a family argument in April of 2019, I.H. told her that petitioner touched her genitals. The mother said the family argument began with a debate about whether petitioner told the child to kill her brothers. The mother testified that she initially believed I.H. and began to hit petitioner before R.H. called the police, and that they ultimately took I.H. to a local hospital. However, the mother testified that she no longer believed I.H.'s allegations against petitioner, saying that the child would refer to petitioner as "papa" and "daddy" and would hug him. The mother also testified that I.H. would show petitioner her breasts. Specifically, the mother testified that I.H. showed her breasts to petitioner when they were playing marbles on one occasion. The mother testified that, when she left the game to check on some food, I.H. allegedly lowered her blouse in front of petitioner. The mother admitted she did not witness the alleged incident but that petitioner informed her of it. On cross-examination, the mother acknowledged that she never witnessed I.H. expose her breasts to anyone. The mother also testified that she told petitioner to "be careful with [I.H.], she [is] going to get you in trouble." The mother further testified that she did not believe

I.H.'s allegations because the child inquired what would happen to the parents if sexual abuse occurred.

Next, a CPS caseworker testified to many of the allegations in the petition. The caseworker testified that she began her investigation after receiving a referral of alleged sexual abuse when I.H. was at the hospital. According to the CPS worker, the mother informed her that I.H. would spend the night in a hotel room after leaving the hospital, but that the mother did not inform her that I.H. would be left alone in the hotel room. The CPS worker then testified that she had arranged for I.H. to participate in a forensic interview in Winchester, Virginia, where they had a facilitator who could speak Spanish, I.H.'s first language. The CPS worker testified that the mother cancelled the forensic interview on the date it was to take place, claiming that I.H. did not want to participate. The CPS worker further testified that during a subsequent interview with I.H., the worker learned that the child did not know about the scheduled forensic interview, and the child said that, if she had known about the interview, she would have wanted to participate. After the forensic interview was cancelled, the CPS worker testified that she interviewed the child at her school in the presence of a Spanish teacher acting as an interpreter, and a law enforcement officer. The CPS worker testified that I.H. told her that petitioner came into her room and touched her genitals over her clothing. The CPS worker further testified that the child said petitioner showed her a video of himself and the mother engaging in sexual intercourse and asked her if she wanted to have sex with another orchard worker. Finally, the CPS worker testified that she witnessed I.H. make similar allegations in a subsequently scheduled forensic interview. The DHHR also proffered that petitioner's cell phone, that had been was seized by law enforcement, held no videos found consistent with disclosures made by I.H.

Finally, petitioner testified and denied all of the allegations made against him by I.H. Petitioner testified that the child was lying either because he never paid attention to her or because she was angry at the mother. Petitioner also testified that I.H. would only speak to and confide in him when she was upset with the mother. Petitioner stated that I.H. would "insinuate" herself to him, but that he would never give into her. Additionally, petitioner acknowledged that, although he consumed alcohol, he drank only occasionally with the mother and never to the point of intoxication. Conversely, petitioner also admitted that when he drank, he could consume a twelve-pack of beer in one sitting in addition to consuming any alcohol that the mother did not consume. Petitioner testified he usually drank on Saturday evenings.

After hearing the evidence, the circuit court found that I.H.'s disclosures were "remarkably consistent and credible." The circuit court further found that petitioner's denial of the sexual abuse allegations was not credible and that I.H. had no credible motive to fabricate her disclosures. Accordingly, the circuit court found that petitioner sexually abused I.H. and that the mother failed to protect the child. As such, the circuit court adjudicated petitioner as an abusing and neglecting custodian. The circuit court also found that the DHHR was not required to make reasonable efforts to preserve the family unit based upon its finding that petitioner had sexually abused I.H., which constituted aggravated circumstances pursuant to West Virginia Code § 49-4-602(d)(2)(E).

In June of 2020, the circuit court held a dispositional hearing wherein the DHHR and guardian moved to terminate petitioner's custodial rights. The DHHR also moved to terminate the biological father's parental rights based on his lack of participation in the proceedings. The DHHR

argued that the father was living outside of the country and had no communication with the children or the DHHR throughout the proceedings. Next, the DHHR put on evidence that petitioner sexually abused I.H. Additionally, a CPS caseworker testified that there were no services that the DHHR could provide to petitioner to remedy the conditions of abuse and neglect. The caseworker also testified that petitioner did not seek services from the DHHR. The caseworker further testified that she had spoken with the children, and they made it clear to her they did not want to live with petitioner or the mother. Petitioner did not testify at the hearing. After considering the evidence, the circuit court terminated petitioner's custodial rights to I.H., O.H., and R.H. In support, the circuit court found that petitioner sexually abused I.H. Based on this evidence, the circuit court concluded that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future and that termination of petitioner's custodial rights was necessary for the children's welfare. Petitioner now appeals the July 27, 2020, dispositional order.[2]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in finding by clear and convincing evidence that he abused and neglected the children. Petitioner argues that the circuit court did not have sufficient evidence at adjudication to find that he engaged in the alleged abuse. We disagree and find that petitioner is entitled to no relief.

> At the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected . . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

---

[2]The mother's and biological father's parental rights were also terminated below. The permanency plan for O.H. and R.H. is adoption by their foster family. I.H.'s permanency plan is adoption after she is discharged from a specialized facility.

4

*In re F.S.*, 233 W. Va. 538, 544, 759 S.E.2d 769, 775 (2014). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Id*. at 546, 759 S.E.2d at 777 (citation omitted). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id.* (citation omitted). Further,

> "[West Virginia Code § 49-4-601(i)], requires the [DHHR], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing [evidence].' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the [DHHR] is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).

Syl. Pt. 1, *In re Joseph A.*, 199 W. Va. 438, 485 S.E.2d 176 (1997) (citations omitted).

Here, the circuit court found that petitioner sexually abused I.H. based upon the child's "remarkably consistent and credible" disclosures. On appeal, petitioner's arguments in support of this assignment of error are all predicated on his assertions that the circuit court erroneously weighed the evidence in question. However, the rulings to which petitioner cites all come down to the issue of credibility, and, as this Court has long held, "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997).

On appeal, petitioner first attacks I.H.'s credibility and argues that the circuit court erred in adjudicating him as an abusing custodian. Petitioner argues that I.H.'s allegations lacked corroborating evidence. Specifically, petitioner argues that the only allegation for which corroborating evidence would have been available to the DHHR was the alleged video depicting petitioner and the mother engaging in sexual acts. Petitioner contends that law enforcement seized his phone after I.H.'s allegations and that he confirmed with them that "no such video could be found" on the phone. However, the record shows that the circuit court reviewed the CPS caseworker's testimony, as well as I.H.'s interviews, and found that the child's allegations were credible. Furthermore, the CPS worker testified that I.H.'s interviews had no "red flags" and that I.H.'s responses were consistent with the allegations in the petition. As for petitioner's claim that he did not sexually abuse I.H. and that the child was lying, the circuit court found that testimony to be incredible and the record supports that finding. Further, petitioner completely disregards I.H.'s disclosures during her interviews with the CPS worker and a forensic worker in which I.H. gave detailed accounts of her sexual abuse. Those accounts are identical to those I.H. disclosed to the mother. It is important to note that, in the criminal context, sexual abuse may be proven solely with the victim's testimony, even if that testimony is uncorroborated. Syl. Pt. 5, *State v. Beck*, 167 W. Va. 830, 286 S.E.2d 234 (1981). Given that uncorroborated testimony is sufficient to satisfy the higher standard of proof in a criminal proceeding, it is clear that I.H.'s consistent disclosures regarding petitioner's sexual abuse were sufficient to satisfy the clear and convincing burden of proof below.

Further, petitioner acknowledges that, during a family argument in April of 2019, I.H. alleged that he touched her inappropriately. Petitioner contends that after I.H.'s disclosures, he called the police. However, the mother testified that she initially believed I.H. and that she asked R.H. to call the police. As for petitioner's testimony at the adjudicatory hearing that he never drinks to the point of intoxication and that he does not pass out from drinking, petitioner acknowledged that he would drink an entire twelve-pack of beer in one sitting as well as any leftover alcohol that the mother would not finish. As for petitioner's cell phone, the DHHR also confirmed that it did not contain any videos consistent with I.H.'s disclosures. In light of the above evidence, the circuit court did not err in finding that I.H. was sexually abused in the home, and that petitioner perpetrated said abuse. Accordingly, we find no error in the circuit court's adjudication of petitioner.

Next, petitioner argues that the circuit court erred by failing to comply with Rule 8(b) of the Rules of Procedure for Child Abuse and Neglect Proceedings when it conducted an in camera interview of R.H. Petitioner argues that the circuit court failed to provide him an opportunity to submit questions or make the interview available. Upon our review, we find no error. We have previously held that

> "[t]he West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard." Syl. Pt. 1, in part, *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995).

Syl. Pt. 3, *In re J.S.*, 233 W. Va. 394, 758 S.E.2d 747 (2014). Here, petitioner claims that the circuit court erred in failing to provide him the opportunity to submit questions for the in camera interview as well as failing to provide copies of the interview in violation of Rule 8(b). We disagree. Importantly, petitioner objected to the circuit court's consideration of the in camera interview and, in response, the circuit court agreed not to consider the interview, thereby granting petitioner the relief he sought. The circuit court further affirmed in its dispositional order that it did not take the interview into account in reaching disposition. Accordingly, we find that petitioner suffered no prejudice with regard to the interview because the circuit court ruled in petitioner's favor and disregarded R.H.'s in camera interviews in reaching its final determination.

To the extent petitioner argues that, absent the in camera interviews, the DHHR failed to meet its burden of proving that there was no reasonable likelihood that he could correct the conditions of abuse in the near future, we note that the evidence presented established that petitioner sexually abused I.H. As such, we find no merit to petitioner's argument in this regard and more fully discuss the termination of his custodial rights below.

Finally, petitioner argues that the circuit court erred in terminating his custodial rights. According to petitioner, there was insufficient evidence to find that he abused and neglected the children and, therefore, the circuit court committed reversible error by terminating his custodial

rights. We disagree and find that the substantial evidence laid out above supports termination of petitioner's custodial rights.

West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate custodial rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the children's welfare. According to West Virginia Code § 49-4-604(d), "'no reasonable likelihood that conditions of neglect or abuse can be substantially corrected' means that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help." As set forth repeatedly above, petitioner's failure to acknowledge the conditions at issue in his case have rendered them uncorrectable. *In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) ("Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect . . . , results in making the problem untreatable."). In terminating petitioner's custodial rights, the circuit court specifically found by "clear, convincing, and cogent evidence that [petitioner] sexually abused [I.H.]." The circuit court also found that there was "no reasonable likelihood that conditions of abuse and neglect can be remedied in the future." Pursuant to West Virginia Code § 49-4-604(c)(6), circuit courts may terminate custodial rights upon these findings. Additionally, this Court has held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). As such, it is clear that the circuit court did not err in terminating petitioner's custodial rights.

Lastly, because permanency has not yet been achieved for one of the children, this Court reminds the circuit court of its duty to establish permanency for the child. Rule 39(b) of the Rules of Procedure for Child Abuse and Neglect Proceedings requires that

> [a]t least once every three months until permanent placement is achieved as defined in Rule 6, the court shall conduct a permanent placement review conference, requiring the multidisciplinary treatment team to attend and report as to progress and development in the case, for the purpose of reviewing the progress in the permanent placement of the child.

Further, this Court reminds the circuit court of its duty pursuant to Rule 43 of the Rules of Procedure for Child Abuse and Neglect Proceedings to find permanent placement for the child within twelve months of the date of the disposition order. As this Court has stated,

> [t]he [twelve]-month period provided in Rule 43 of the West Virginia Rules of Procedure[] for Child Abuse and Neglect Proceedings for permanent placement of

7

an abused and neglected child following the final dispositional order must be strictly followed except in the most extraordinary circumstances which are fully substantiated in the record.

*Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, syl. pt. 6. Moreover, this Court has stated that

[i]n determining the appropriate permanent out-of-home placement of a child under [West Virginia Code § 49-4-604(c)(6)], the circuit court shall give priority to securing a suitable adoptive home for the child and shall consider other placement alternatives, including permanent foster care, only where the court finds that adoption would not provide custody, care, commitment, nurturing and discipline consistent with the child's best interests or where a suitable adoptive home [cannot] be found.

Syl. Pt. 3, *State v. Michael M.*, 202 W. Va. 350, 504 S.E.2d 177 (1998). Finally, "[t]he guardian ad litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home." Syl. Pt. 5, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991).

For the foregoing reasons, we find no error in the decision of the circuit court, and its July 27, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**:  April 20, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton