**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**


*In re* **A.B.-1, P.B., J.B., and A.B.-2**

**No. 21-0285** (Webster County 20-JA-5, 20-JA-6, 20-JA-7, and 21-JA-1)


**MEMORANDUM DECISION**


Petitioner Father A.B.-3, by counsel Steven B. Nanners, appeals the Circuit Court of Webster County's March 16, 2021, order terminating his parental rights to A.B.-1, P.B., J.B., and A.B.-2.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Mary Elizabeth Snead, filed a response on behalf of the children also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in denying him a post-adjudicatory improvement period and terminating his parental rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner and the children's mother have a significant history of Child Protective Services ("CPS") intervention. The DHHR filed a petition against the parents in 2013 due to their substance abuse, poor home conditions, and medical neglect of the children. The circuit court adjudicated the parents as abusing and neglecting parents and granted them a post-adjudicatory improvement period, which they successfully completed. As such, the children were returned to their custody. Subsequently, in 2018, the DHHR filed another petition against the parents due to substance abuse, poor home conditions, and domestic violence. The circuit court again adjudicated them as abusing

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Because two of the children and petitioner share the same initials, we will refer to them as A.B.-1, A.B.-2, and A.B.-3 respectively, throughout the memorandum decision.

and neglecting parents and granted them a post-adjudicatory improvement period. The parents also completed these improvement periods, and the children were returned to their custody in May of 2019.

Only a few months later, in January of 2020, the DHHR filed the instant abuse and neglect petition against the parents. According to the DHHR, then fourteen-year-old J.B. disclosed to her school principal that her mother choked her and hit her with a telephone. The child further disclosed that the parents were abusing drugs, that she had seen a white powdery substance and a straw on a countertop in the home, and that the home smelled of marijuana. J.B. further indicated that she did not feel safe in the home. Following J.B.'s disclosure, a CPS worker responded to the parents' home and informed them of the referral concerning possible drug use. The parents were agitated during the exchange and frequently went in and out of petitioner's parents' home, which was next door, and refused to allow the CPS worker or law enforcement into their own home. Eventually, the parents agreed to submit to a drug screen at the local hospital, which was positive for oxycontin. Thereafter, the CPS worker petitioned for and received a ratification for emergency custody of the children, who were placed with the paternal grandparents with instructions that no contact between the children and the parents was to occur.

A few days later, J.B. informed a CPS worker that on the day her parents submitted to a drug screen, they called the paternal grandparents' home to request that J.B. urinate in a cup and bring it to them so they would not "go to jail." J.B. indicated that the parents had previously asked her to urinate in a cup for them. She also disclosed that petitioner had been to the paternal grandparents' home every day since the children had been removed from the parents' care and told the children not to talk to CPS. Lastly, J.B. indicated that she chose to disclose the allegations against her parents because they had become increasingly aggressive with each other and had struck the child P.B.

Based on this information, the DHHR alleged that the parents abused drugs, which negatively affected their ability to provide for the health, safety, and welfare of the children, and that they failed to provide a fit and suitable home. An amended petition was filed shortly thereafter indicating that petitioner tested positive for methamphetamine following a hair follicle test.

The circuit court held an adjudicatory hearing in May of 2020. A CPS worker testified regarding the allegations in the petition, including J.B.'s disclosures and the worker's subsequent investigation into the matter. The CPS worker testified that J.B. reported drug abuse in the home and further testified that the parents tested positive for oxycontin on the day of the removal. A CPS supervisor also testified regarding J.B.'s disclosures stating that the child said that on the day the children were removed from the home, petitioner asked J.B. to urinate in a cup for him so that he could use her urine to pass his drug test, and that he had asked J.B. do so on prior occasions. Petitioner's therapist testified that petitioner denied the allegations made by J.B. but admitted that he later tested positive for methamphetamine through a hair follicle test.

Petitioner testified that J.B. fabricated the allegations against him and the mother because they would not allow her to date an older boy. Petitioner admitted testing positive for methamphetamine through the hair follicle test and explained that he "slipped up one evening in November" of 2019. Petitioner denied abusing oxycontin as alleged in the petition, noting that the

screen was not sent for laboratory confirmation and that the hair follicle test had not shown traces of oxycontin. Petitioner denied further drug abuse and domestic violence in the home.

Following testimony, the circuit court noted that it had watched J.B.'s Child Advocacy Center interview and observed that the child was very hostile and angry; the court indicated that it considered her behavior in weighing the credibility of her statements. The circuit court also noted inconsistencies in the parents' testimony and ultimately determined that J.B.'s disclosures were credible. The circuit court found that the parents accused J.B. of making up the allegations against them because they allegedly angered her by telling her that her boyfriend was too old for her, but there was no evidence to support such an allegation. The circuit court further found that the parents engaged in domestic violence in the children's presence, abused drugs, and failed to maintain a fit and suitable home. Accordingly, the circuit court adjudicated petitioner as an abusing parent.

Subsequently, in October of 2020, the mother gave birth to A.B.-2, and the DHHR filed an amended petition adding the child to the proceedings.[2] A.B.-2 was removed from petitioner's custody at that time. The circuit court adjudicated the parents as abusing parents with regard to A.B.-2 in November of 2020.

The circuit court held a dispositional hearing in January of 2021. The DHHR presented the testimony of the parents' counselor, who testified that she had previously provided counseling to petitioner during a prior case and had done so throughout the instant case, addressing issues such as substance abuse, parenting, anxiety, and depression. The counselor opined that petitioner made some progress throughout the proceedings, was cooperating during the sessions, and was motivated to change his behavior. However, the counselor acknowledged that the parents had been contacting J.B. in violation of the court's order and that the mother was urging the child to "tell the truth" by retracting her statements of abuse. Moreover, the counselor admitted that she did "not disagree" with a psychologist's determination that petitioner had an extremely poor prognosis of attaining minimally adequate parenting skills.

Next, J.B.'s foster mother testified regarding contact between the child and the parents. The foster mother explained that the parents were prohibited from contacting J.B., but that the child admitted that she and the parents remained in contact via Facebook Messenger. J.B. disclosed that before contact with her parents was prohibited, she attended a supervised visit wherein petitioner managed to slip a cellphone into her bag unnoticed by the service provider. The foster mother testified that she searched the child's bag, found the cellphone, and read messages sent to J.B. by the parents. The foster mother stated that the parents were encouraging J.B. to change her story and tell the DHHR that she fabricated the allegations against the parents.

The DHHR also called the evaluating psychologist to testify regarding her evaluations of petitioner, J.B., and A.B.-1. Regarding J.B., the psychologist testified that she diagnosed her with major depressive disorder due to her reported history of suicidal ideation and self-harm, as well as problems related to sleep, worry, and self-esteem. When asked what the cause of these problems could be, the psychologist stated that "when a child, you know, of her age is having those types of severe behaviors, including the cutting and the suicidal ideation, and those types of things, there's

---

[2]Petitioner is the father of A.B.-2.

always a concern for the environment that she was in." The psychologist further opined that it would be better "in the long run" for J.B. to not return to the parents' care based upon the number of removals and the fact that the parents failed to rectify the issues leading to the children's removal over multiple cases and with services. Likewise, the psychologist opined that it would not be in A.B.-1's best interest to be returned to the parents' care. The psychologist noted that A.B.-1 was diagnosed with autism and cerebral palsy and required significant care. Further, A.B.-1 needed a stable, consistent home environment that would provide him with the services he needed. The evaluator also opined that petitioner blamed others instead of accepting responsibility for his actions, which indicated that he had little motivation to make long-term changes. The evaluator concluded that "[g]iven [petitioner's] lack of accountability, failure to correct the abuse and neglect present in the previous cases, failure to benefit from services, as well as long-term substance dependence, and lack of significant periods of sobriety, . . . [petitioner's] prognosis for improved parenting . . . is extremely poor." The evaluator also stated that she was not aware of any additional services that could be provided to petitioner to correct the circumstances of abuse.

The DHHR's next witness, a service provider, testified that she provided the parents with parenting classes in both the 2018 case and the instant case. The service provider stated that the parents were cooperative and appeared to understand the concepts of the material taught but continued to deny the allegations against them, instead blaming J.B. for the situation. The service provided further stated that petitioner denied giving J.B. a cellphone during a supervised visit. A CPS worker corroborated the service provider's testimony that petitioner was compliant with services.

Petitioner presented the testimony of another service provider who supervised his visits with the children. The provider testified that petitioner did well with the visits, appeared bonded with the children, provided food and activities, and was loving towards the children. Petitioner requested a post-adjudicatory improvement period. He testified that he complied with services, remained drug-free throughout the proceedings, and was deeply bonded with his children. Petitioner denied providing J.B. with a cellphone and communicating with her, stating that his wife was the one who communicated with the child, unbeknownst to him. When asked what the issues of abuse and neglect were, petitioner stated that he could be "cleanlier" and that his drug use "should never have happened," but denied any domestic violence in the home.

Following respective counsel's arguments, the circuit court found that the children had been removed from the parents' care three times, but that petitioner failed to accept responsibility for his actions and consistently blamed J.B. for the proceedings. Further, the issues in the instant case included drug use and poor home conditions, which were identical to the issues in the prior two cases. While the parents accused J.B. of lying throughout the case, the circuit court found that such accusations were contrary to the evidence and further found that petitioner's testimony was "less than credible." Ultimately, the circuit court denied petitioner's request for an improvement period and terminated his parental rights upon finding that there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect in the near future and that termination

4

was necessary for the children's welfare. Petitioner appeals the circuit court's March 16, 2021, dispositional order.[3]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in denying his motion for an improvement period and in terminating his parental rights. According to petitioner, he was fully compliant with the services offered by the DHHR, remained drug-free throughout the proceedings, scheduled his own counseling and appointments, and appeared at all hearings and multidisciplinary team meetings. Petitioner also argues that testimony established that he was cooperative and compliant with services, had a bond with the children, and completed everything requested of him by the DHHR and the court. Based on the foregoing, petitioner contends that he met his burden of establishing he was likely to participate in an improvement period, and further contends that there was a reasonable likelihood that he could correct the conditions of abuse and neglect in the near future.

The decision to grant or deny an improvement period rests in the sound discretion of the circuit court. *See In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015) ("West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period."); Syl. Pt. 6, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996) ("It is within the court's discretion to grant an improvement period within the applicable statutory requirements[.]"). We have also held that a parent's "entitlement to an improvement period is conditioned upon the ability of the [parent] to demonstrate 'by clear and convincing evidence that the respondent is likely to fully participate in the improvement period.'" *In re Charity H.*, 215 W. Va. 208, 215, 599 S.E.2d 631, 638 (2004). However, the circuit court has discretion to deny an improvement period when no improvement is likely. *See In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). Further, we have previously held that

---

[3]The mother's parental rights were also terminated below. The permanency plan for the children is adoption.

[i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted).

In support of his argument, petitioner cites to *In re S.J., A.J.-1, and A.J.-2*, No. 18-0243, 2018 WL 6119793 (W. Va. Nov. 21, 2018)(memorandum decision); however, this case does not support petitioner's claim that the circuit court erred in failing to grant him a post-adjudicatory improvement period. In *In re S.J.*, a circuit court found that a mother failed to accept responsibility for abusing and neglecting her children and denied her motion for an improvement period. *Id.* at *2. However, the record in those proceedings did not support the circuit court's findings. Rather, in *In re S.J.*, the DHHR worker who testified during the proceedings admitted she was unprepared to testify, did not prepare the mother's case plans, and had not even read the circuit court's adjudicatory order. *Id.* at *2. There are no such extenuating factors in these proceedings. In *In re S.J.*, this Court also found that the record demonstrated that the mother accepted full responsibility for her abuse and neglect. *Id.* at *4. Here, the record clearly demonstrates that petitioner refuses to accept full responsibility for his abuse and neglect of the children by repeatedly denying the allegations in the petition, despite the circuit court's findings in support of the same, and by blaming J.B. for initiating the proceedings. Therefore, the facts underlying the *In re S.J.* decision are wholly distinguishable from the facts in the case at bar.

Contrary to petitioner's argument, we see no error in the circuit court's determination that petitioner was not likely to fully participate in an improvement period. As noted above, the circuit court found that petitioner failed to accept responsibility for his drug abuse, domestic violence, or poor home conditions which led to the abuse and neglect of the children. Specifically, petitioner accused J.B. of fabricating the allegations and claimed she did so because he told her she was not allowed to date an older boy, despite ample testimony and evidence to the contrary, and the circuit court's findings in support of the same. While petitioner argues that he complied with services, remained drug free, and had a bond with the children, the record establishes that this is petitioner's third CPS case and that he was provided improvement periods with extensive services on two prior occasions, yet regressed to his abusive behavior after the children were returned to his care. Moreover, the evaluating psychologist testified that petitioner's prognosis for attaining minimally adequate parenting was extremely poor given petitioner's refusal to accept responsibility for his actions and his past participation in abuse and neglect proceedings without any significant improvement. Further, the DHHR maintains that there are no further services that could be offered to assist petitioner in improving his parenting. Therefore, we find that the circuit court did not abuse its discretion in denying petitioner an improvement period.

We likewise find no error in the termination of petitioner's parental rights. West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate parental rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the children's welfare. West Virginia Code § 49-4-604(d) provides that a circuit court may find that there is no reasonable

likelihood that the conditions of abuse and neglect can be substantially corrected when the abusing parent has "demonstrated an inadequate capacity to solve the problems of abuse or neglect on [his or her] own or with help."

The record establishes that petitioner demonstrated an inadequate capacity to solve the problems of abuse or neglect on his own or with help. As noted above, petitioner was provided an improvement period in both of his prior cases, with services such as parenting and adult life skills classes and counseling, but reverted to his abusive behavior each time the children were returned to his care. Indeed, the children were returned to petitioner in May of 2019, and the instant petition was filed against him less than one year later, in January of 2020. While petitioner correctly asserts that he complied with services and tested negative for drugs throughout the proceedings, he denied the allegations of abuse, claimed J.B. was lying, and refused to accept responsibility for his actions. However, the circuit court found that J.B.'s disclosures of abuse were credible and that petitioner's testimony to the contrary was not credible. Moreover, the evaluating psychologist determined that petitioner's prognosis for attaining minimally adequate parenting was extremely poor and that it was not in the children's best interests to return to his care. To the extent petitioner claims he should have been granted a post-adjudicatory improvement period prior to the termination of his parental rights, we have held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Given petitioner's failure to acknowledge the conditions of abuse and accept responsibility for his actions, we find that the circuit court did not err in terminating his parental rights.

Lastly, because the DHHR has not yet found an adoptive placement for the children, this Court reminds the circuit court of its duty to establish permanency for the children. Rule 39(b) of the Rules of Procedure for Child Abuse and Neglect Proceedings requires:

> At least once every three months until permanent placement is achieved as defined in Rule 6, the court shall conduct a permanent placement review conference, requiring the multidisciplinary treatment team to attend and report as to progress and development in the case, for the purpose of reviewing the progress in the permanent placement of the child.

Further, this Court reminds the circuit court of its duty pursuant to Rule 43 of the Rules of Procedure for Child Abuse and Neglect Proceedings to find permanent placement for the children within twelve months of the date of the dispositional order. As this Court has stated,

7

> [t]he [twelve]-month period provided in Rule 43 of the West Virginia Rules of Procedure[ ] for Child Abuse and Neglect Proceedings for permanent placement of an abused and neglected child following the final dispositional order must be strictly followed except in the most extraordinary circumstances which are fully substantiated in the record.

*Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, syl. pt. 6. Moreover, this Court has stated that

> [i]n determining the appropriate permanent out-of-home placement of a child under [West Virginia Code § 49-4-604(b)(6)], the circuit court shall give priority to securing a suitable adoptive home for the child and shall consider other placement alternatives, including permanent foster care, only where the court finds that adoption would not provide custody, care, commitment, nurturing and discipline consistent with the child's best interests or where a suitable adoptive home [cannot] be found.

Syl. Pt. 3, *State v. Michael M.*, 202 W. Va. 350, 504 S.E.2d 177 (1998). Finally, "[t]he guardian ad litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home." Syl. Pt. 5, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991).

For the foregoing reasons, we find no error in the decision of the circuit court, and its March 16, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: October 1, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton